STATE, USE OF MARGARET E. CHENOWETH ET AL.,
v. BALTIMORE CONTRACTING COMPANY.

[No. 51, April Term, 1939.]

2

4

Decided June 6th, 1939.

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Leonard Weinberg* and *Everett L. Buckmaster,* with whom were *George H. Dowell* and *Weinberg, Sweeten & Green,* on the brief, for the appellants.

*Rignal W. Baldwin, Jr.,* with whom were *William A. Fisher, Jr.,* and *Semmes, Bowen & Semmes,* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Pennsylvania Railroad Company leases from the Northern Central Railway Company a railroad coal yard at the foot of Clinton Street in Baltimore City, which it uses for the transfer of coal from its cars to ships tied up at a pier adjacent to the yard. The yard, known as No. 2, is equipped with railroad tracks, switches, a tipple, an elevated railway over which small hopper cars carry coal from the tipple to the ships, and other equipment designed to facilitate the transfer.

The whole yard is divided into a "gravity yard" and an "empty yard." The tracks run generally east and west. Loaded cars enter the yard from the west and are pushed into the "gravity yard" by a locomotive, and brought to a stop on a grade sloping west. Then they are released one by one and permitted to run by gravity west past the tipple, where they are switched on to a track running to the tipple, and there engage a device

known as a "dolly," which pulls them east upon the tipple. There by certain clamps the cars are seized, overturned, and emptied into the hopper cars, which carry the coal west again to the loading ship. After the freight cars are unloaded they are allowed to run by gravity eastward into the "empty yard," where they stand until a sufficient number accumulate to require their removal from the yard. The tipple is an elevated structure higher than the surface of the yard and also higher than the elevated railway, so that all cars leaving it run east or west by gravity.

There is one track running east from the tipple to the "empty yard" which, at a point known as the "clearing point," branches off into other tracks in that yard.

To avoid blocking the "empty yard" it is necessary to take empty cars beyond that point. In moving the empty cars to the "empty yard," one car will be permitted to drift easily down a grade on the track leading to the "empty yard" to some point west of the "clearing point," and held there by a mechanical brake, and as other cars are emptied they will be run behind the first car, until the operative decides that the "draft" is large enough to be run into the "empty yard." The whole process of transferring the coal is done, not by the railroad company, but by the Baltimore Contracting Company, Inc., and for that purpose the entire yard is under its control and supervision. But to insure the safe and adequate operation of its track, cars, and equipment, the railroad company at all times employs its own servants and agents, and charges them with the duty of seeing that its cars and equipment are in safe and serviceable condition. On September 21st, 1937, it employed for that purpose two inspectors, Oliver D. Chenoweth and John E. Thompson, both of whom had been in the same employment there for many years. Their duties required them to inspect the cars, to make minor repairs, to discover defects and the absence of essential parts of the braking mechanism and other equipment of the cars, and their work naturally required them to be, at times, in, on, under, and between the cars.

On the morning of that day the body of Chenoweth was found crushed under the trucks of a standing car in the "empty yard." There were no eyewitnesses of the accident, but, assuming that the position of his body permitted the inference that his death was caused by the negligence of the Baltimore Contracting Company, Inc., the surviving widow and children of Chenoweth brought this action against that corporation to recover compensation under the provisions of Code, art. 67. At the conclusion of the plaintiff's case the court directed a verdict for the defendant, and from the judgment on that verdict this appeal was taken.

The record submits seventy exceptions, of which one relates to the granting of the defendant's demurrer prayers, and the others to rulings on the admissibility of evidence.

The nature of the case requires this court to value all the evidence to determine whether it is legally sufficient to support an inference that the accident which resulted in the death of Oliver D. Chenoweth was caused by the defendant's negligence. In that inquiry, as of course, the truth of any and all evidence and all proper and legitimate inferences deducible therefrom tending to support plaintiff's claim is conceded.

That the purpose and significance of the evidence may be more readily understood, the conflicting theories of the parties as to their respective rights and liabilities will first be stated.

The appellant's contention is that the position in which the decedent's body was found permits the inference that the accident which caused his death resulted from some sudden, violent, and unexpected movement of the train of cars under which he was found, and on which he was at the time employed in the performance of his duties as a car inspector, that there was no warning of the movement, and that the decedent was under no duty to anticipate it, but that the defendant, knowing that the decedent might be at work on one of the cars of the train, was under a duty (a) to so operate the cars as to

avoid endangering him, or, (b) if the normal operation of the cars necessarily created a danger, to warn him thereof, and that his death was caused by a breach of that duty.

The appellee contends (1) that no inference of negligence can be drawn from the mere fact that the decedent was killed by a car under its control, (2) that there is no legally sufficient evidence of any unusual or negligent operation of the car which caused the death, but that on the contrary the uncontradicted evidence shows that it was operated in the normal and accustomed manner with which the decedent had long been familiar, (3) that in the absence of certain protective warnings and signs which the decedent for his own protection was required by the rules of the railroad company and the custom of the defendant to give, it was under no duty to anticipate his possible presence on the train, and (4) was not therefore under any duty to warn him of a usual and customary movement which was an ordinary incident of the work but which might endanger him if in fact he was on the train.

The evidence in the case is consistent with the following statement of fact:

In the course of transferring the coal from the cars to a ship, the loaded cars are brought into the "gravity yard," and left standing on a grade sloping towards the tipple. They are released one at a time, and permitted to run by gravity beyond and west of the tipple, they are then pulled eastward up a grade to the tipple, unloaded, and then allowed to drift eastward on a track sloping from the tipple down to the "empty yard." In a given movement, the first empty car is stopped on that slope west of the clearing point and held there by a mechanical brake, until other cars accumulate behind it, held in position by the first car. When the train or draft has a sufficient number of cars, a brakeman employed by the defendant releases the brake on the first car and permits the whole train to drift into the "empty yard," which is level, and to stand there with the brakes re-

8

leased. If there is not enough room between cars on the track in the "empty yard" and the "clearing point" to permit the latest draft to come to a stop without blocking the clearing point, the brakeman on the latest draft uses it to bump into the standing train and push it farther along the track. He stands at times at the front of the first car, and at times at the rear, accordingly as the brake happens to be at one end or the other, but in neither position would he be able to see persons standing beside cars on the track ahead of him or between them.

As stated above, the track running east from the tipple to the "empty yard" branches at the "clearing point" into several tracks. The south track is called Track No. 5, and near and north of it is another track called Track No. 4. It was Chenoweth's duty to inspect the cars while they were loaded and standing in the "gravity yard" and also after they had been unloaded and standing in the "empty yard." On the morning of September 21st, Track No. 5 was full, and there were four cars on Track No. 4, about eight car lengths from the "clearing point." Chenoweth and Thompson having some work to do on those cars, were proceeding together towards the "empty yard," when they separated. Chenoweth left Thompson to put a key in a brake of one of those cars, and Thompson went to the machine shop for a drink of water. He saw nothing more of Chenoweth until his body was found about thirty minutes later. After he left two drafts were added to the four standing cars, first one of two cars, and then one of seven. There was not space for the seven cars between the standing cars and the "clearing point," and it was necessary for the brakeman managing that draft to bump or push the six cars farther along. There was no evidence that the brake which he operated was defective, that the movement was unusual, or that any greater force was used than was necessary to clear the track for the seven cars.

Chenoweth's body was found under the rear trucks of the third car from the east end of the train. That par-

ticular car was found to be derailed when the body was found. Thompson, referring to that fact, said: "The leading wheels of one of these cars was completely derailed, off of the track. It was the leading wheel on the east end of the car he was under. The front wheels of the car he was under were both off of the track. The front pair of wheels of the front truck. Each truck consists of four wheels and the two front wheels of the forward truck were both off the rail. They had not been that way before. * * * I don't know how far the front wheels of the front truck were off of the rails but it was right next to the rail. There was evidence there to show that those wheels that had come off the rails had run along the ground. I don't remember how far they had run along the ground, but I knew that the car ran along side of the rail along the ground, but I couldn't tell you how far. I imagine pretty near a car length. The train of four cars had been pushed at least a car length, with the front wheels of the trucks of one of those cars altogether off the tracks."

Joseph Stepnowski, on September 21st, 1937, had been employed by the Baltimore Contracting Company, Inc., for nineteen years as the brakeman who took the empty cars from the tipple down the grade into the "empty yard," and he was so employed at the time of the accident. Describing the movement of the two drafts of two and seven cars on to the No. 4 track, he said:

"On the morning of September 21st, 1937, I first put two cars on Track 4 and then a little later the seven more. When I put the two cars in, there were four cars there from the day before, two gondolas and two hoppers, and then I had put two hoppers in that morning. I don't know what time it was I put the two hoppers down there. It was a right good while before I put the seven down, but I really don't know how long. I had been working for some time on a different job before I put the two hoppers in. Then after a little while I brought seven more down, but I don't know how long that was; it was right long time. * * * "Q. When you

came riding down on the draft of seven cars, what did you want to do with them that morning, what were you trying to do? * * * A. When I dropped them seven cars down to make the coupling, I intended to move half a car length to clear, to make room, to clear the track. * * * "Q. Were the brakes all right? A. The brakes were all right. "Q. The brake that you were handling on that first car, could you put it on full, if you wanted to that morning, on that seven car draft, the brakes on the first car of the seven car draft, as you came down there with the seven; were you or not able to put that on full that morning? Tell his Honor. A. Yes, your Honor, I put that brake tight enough to hold on to that brake and hold that draft down so it come down about three miles an hour before I come to a stop." And he further testified that he gave no warning because he saw nobody to warn.

The same witness also gave this testimony:

"When we leave empty cars standing in the empty yard over night we do not put the brakes on to hold them still. No brakes are put on cars in the empty yard. We have been told not to leave the brakes on cars standing in the empty yards. That is the instructions I have from Mr. Walker, the foreman, when I started to work, not to leave brakes on in the empty yard. Why, I don't know. "Q. During the years that you worked for the Baltimore Contracting Company as a car rider, you saw, did you not, every day, at all hours of the day, car inspectors walking around, near and inspecting and making light repairs to empty cars standing on the tracks, did you not? * * * Q. Do you understand that question? A. Yes, I see car inspectors walking around them cars inspecting them, providing if the track is filled in and the switch is thrown the opposite way and a blue flag is there. "Q. You say that you only saw car inspectors walking up and down examining cars when blue flags were out? Is that what you say? * * * "Q. Do you tell the court that you only saw car inspectors walking up and down, examining cars, tapping them,

looking at them, when blue flags were out? * * * A. I misunderstood the question, I misinterpreted this question. Yes, I see car inspectors walking on both side many a time, but when they had slight repairs to do they closed that switch on that draft and put the blue flag on that draft and notify me and also notify my foreman, Mr. Walker. Q. You tell the court and jury that during the time you have worked there every time a car inspector wanted to make any slight repairs at all they first closed the switch, put a blue flag out, and notify you or your foreman? A. That's right. Q. Every time? A. Every time. Q. And that has been true the whole number of years you have worked there? A. As soon as the blue flag comes in effect, whenever the blue flag comes in effect. Q. In other words, there are some things that the car inspectors do there without putting up a blue flag are there not? * * * A. I don't know."

Cross examined he testified: "I have been doing this king of work for about nineteen years and I took my orders from Mr. Alfred Walker, my boss. I did what he told me to do and only that. He is the one who told me that when men were working on the cars the switch would be thrown and a blue flag up and I would be told and Mr. Walker also would be told. Q. And it was your understanding that when the switch was open on any track and no blue flag up and no notice had been given you or the tipple, that it was all right to carry cars down into the empty yard? A. That gave me the right of way. Q. And you have seen the blue flag up on one of these five tracks on numerous occasions, haven't you? A. Yes. Q. And have you seen the switch thrown at one or another of the tracks from time to time when the blue flag was up? A. I see the blue flag was on and the switch was closed. I have been notified at the tipple by car inspectors not to carry cars down on certain sidings. I respected those notifications and warning signals. I always have. Q. On this particular occasion did you see any blue flag on track No. 4? A. That morning? Q. That morning, yes. A. No. Q. At that time that morn-

ing on No. 4 track? A. There wasn't no blue flag on that track for the last two days since I was running cars, from Monday, and running on the following day, Tuesday. I did not see a blue flag on Track 4 any time on the morning of September 21st, and I did not see the switch thrown to close No. 4 Track that morning. I did not receive any instructions from any one that morning not to run cars on No. 4 Track."

He also testified that the brake worked properly. On redirect examination he testified as follows: "You knew that when they did that, walked alongside of trains of standing cars, tapped them, looked at them, examined them, opened the doors on them, they did not put out blue flags to do that, did they? * * * Q. They didn't put out blue flags when they were doing that, did they? His Honor said you should answer. A. Yes, they did. Q. Did they put out blue flags when they did that? A. When they inspected cars, they inspected filled track cars, not that track where I was running. Q. What? A. They inspect cars on fulled up tracks, not that track I was running on. Q. You tell the court that they inspected cars only when the tracks were completely full. A. That's right. Q. You tell his Honor that car inspectors working through the yards and inspecting cars only inspect the cars when the track was entirely filled with cars? A. That's right."

Then followed a colloquy between counsel for the parties and the court which apparently left the witness so confused that he was either unable or unwilling to say whether he knew of any change in that practice or custom.

In respect to the rules referred to by Stepnowski, Thompson testified.

"When we are making the repairs in or under cars, we place a blue flag on each end of the track, and in addition to that we notify anyone such as in this particular case, such as the tipple operative so that they will know that we are working on that particular blue flag. In addition to that, while it is not required by the rules, we

throw the switch in opposition to that track, so in case he would happen to forget it, he could not come in against that blue flags and cars, rather. We notify the man who is riding the cars, and if we don't see him, we notify the foreman, Mr. Al Walker. It would be either Mr. Stepnowski or Mr. Walker that we would have notified on this particular morning. The switch that he would throw would be the switch leading into No. 4 Track, if he is working on that track, so that anything coming down would go on the No. 5 Track.

"(The Court) If you are going to work on a standing empty down on the level, you walk back to the tipple and up that incline and tell the operator you are going to operate, you are going to work on such and such a car, or do you send word back by the car rider?

"(The Witness) If we don't see the car rider we go and find him, and, if we can't find him, we tell the foreman. We walk up there and tell him. The car rider is the main man to tell you would get. The blue flags are kept at a post that is in the ground. They are kept near the gravity yard, right between the empty and gravity yard. * * * There were blue flags there on the morning of September 21st, 1937, available for such use. I know they were there of my own knowledge. When that blue flag is so placed on No. 4 Track it is visible from the tipple. It is visible from each point down here along which cars might be stopped preparatory to taking a draft down. We use the blue flag to keep anyone from going in that track and either moving or bumping cars that are in there. The blue flag has been in use in that yard ever since I have been there. I have used it for a similar purpose throughout my railroad experience. It is a standard railroad practice. When the blue flag was so used by me, the flag was respected, that is the car rider did not run his cars beyond the flag. After the accident I did not see any blue flag on No. 4 Track. I did look for it. Let me correct this answer a little bit, I didn't purposely look for it, but I noticed there was none there as I passed by, because I had to go in that direction to go

to the telephone. Later that afternoon when I inspected the cars I did not see any blue flag there or any remnant of a blue flag. * * * The blue flag itself was fourteen inches wide, by nine and three-quarters high, and the shaft of it measures four feet one inch. I imagine it weighs about ten or twelve pounds and is made of wrought iron or steel."

Chenoweth and Thompson as car inspectors knew of these rules, and each of them had been given a copy of them. The rules were the operating rules of the Pennsylvania Railroad Company.

At the time of the accident no blue flag was displayed, nor was any warning of any kind given, so far as the record shows, to any one of the decedent's presence in, about or near the car under which he was found.

James Leo Behr, defendants' foreman, said that in twenty years he had never seen repairs made to a car unless the blue flag was up, although he had seen workmen walking around standing cars, but the witness Thompson also testified that it was not customary to put out a blue flag merely to put "a shoe pin in a car."

The specific rules referred to by these witnesses contain among others these directions:

"Rule 26. 'Train Signals. A blue signal displayed at one or both ends of an engine, car, or train, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Each class of workmen will display the blue signals and the same workmen are alone authorized to remove them. Other equipment must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen.

" 'When emergency repair work is to be done under or about cars in a train and a blue signal is not available, the engineman and fireman will be notified and protection must be given those engaged in making the repairs.' * * * 'The Car Inspector, in the absence of a foreman, will perform the same duties as the foreman in the district assigned him. When inspecting or re-

pairing cars he must protect himself by displaying the signals as prescribed by Rule 26'."

The shoe key is an iron pin bent at one end which secures the brake beam to the brake shoe; it is not fastened and may drop or fall out of place if the car is upset, as in unloading. It is about fifteen inches from the side of the car and may be replaced by an operative standing beside the car but not under it.

Turning now to the exceptions, it is apparent that appellants attempted to prove certain important elements of their case by employees of the defendant and the railroad company.

Because they were so employed, although called and sworn by them, appellants contend that they had the right to impeach these witnesses by cross-examining them as to other statements made at other places at other times in conflict with their statements in this case, and by proof of such contradicting statements. That contention was rejected by the trial court and his rulings in respect to it are the subject of a group of eleven exceptions.

The rule in this state, applicable to such cases, is that a party will not be allowed to impeach his own witness by proof of contradictory statements made on other occasions, nor will he be permitted to cross examine such witness as to any such statement, unless he has been enticed or entrapped into calling him by statements, made to the party or his attorney by the witness, which were inconsistent with his testimony in the particular case in which he is being examined. Upon proof that he has been so surprised or entrapped, the party calling the witness may, to explain why he called him, not only cross examine him as to prior contradictory statements, but offer proof thereof. Such proof however is not substantive evidence and its only effect is to impeach the credibility of the witness. In the absence of any proof of surprise or entrapment, the party calling the witness may not offer proof of prior conflicting statements, but he may by any competent witness prove facts however

inconsistent with those to which the witness under examination testified, although a collateral incident of such proof is to impeach the witness. *Travelers' Ins. Co. v. Hermann,* 154 Md. 171, 140 A. 64; 74 A. L. R. 1069; *Murphy v. State,* 120 Md. 229, 87 A. 811; *Ann. Cas.* 1914B, 1117, note; *Jones on Evidence,* secs. 853, 854; *Selover v. Bryant,* 54 Minn. 434, 56 N. W. 58; 70 *C. J.* 796, 1152, 1153; *Debelius v. C. H. Benson & Co.,* 129 Md. 693, 698, 100 A. 505; *Patapsco Loan Co. v. Hobbs,* 134 Md. 222, 229, 106 A. 619; *Queen v. State,* 5 H. & J. 232; *Franklin Bk. v. Steam Nav. Co.,* 11 G. &. J. 28, 36; *Balto. & O. v. State, use of Woodward,* 41 Md. 268; *Smith v. Briscoe,* 65 Md. 561, 569, 5 A. 334; *Washington, B. &. A. E. R. Co., v. Faulkner,* 137 Md. 451, 112 A. 820. To warran the application of that rule it is not enough that the treacherous or deceitful statements have been made, but they must have been made to the party calling the witness or to his attorney, or to some person to be communicated to them. 70 *C. J.* 1032, *Murphy v. State,* 120 Md. 229, 87 A. 811, *Ann. Cas.* 1914B, 1117, 1133. The reason for the rule is the protection of a party who has been entrapped into calling a treacherous witness who has, by statements made prior to the trial to the party or his attorney, induced the party calling him to reasonably believe that his testimony would be favorable to his contention. 70 *C. J. "Witnesses"* secs. 1227-1229. The wrong at which the rule strikes is the introduction of a hostile witness under the reasonable and well founded belief that he is friendly, and that his evidence will be favorable to the party calling him, when that belief is induced by statements of the witness to the party calling him, to his attorney or to some other person with instructions to communicate the statements to them or either of them.

Where a party knows when he calls a witness that he is hostile or has reason to believe that he is, the rule is not applicable.

Exceptions 33, 34, 35, 36, 43, 44, 57, 61, 62, 67, 68, relate to efforts on the part of the appellant to in-

troduce in evidence, by way of specific offers as well as by examination, statements made by the witness Stepnowski before a coroner and on other occasions, which were supposed to be in conflict with his testimony in this case. The court refused to allow the introduction of that evidence or any reference thereto, and no error is found in those rulings. There was no evidence of surprise or entrapment present. The appellants apparently believed the witness was hostile when he was called, the whole method and manner of his examination showed that. He had made no statement to the appellants nor to their attorney, nor was there any offer to show that appellants were surprised or entrapped by his testimony, other than the fact, implicit in the questions and offers, that on other occasions he had made statements in conflict with his testimony in this case. Such statements could only have been admissible to impeach him if made to appellants or their attorney (*Foble v. Knefely,* 176 Md. 474, 6 A. 2nd 48; *Murphy v. State, supra*), and there was no foundation for their admission for that purpose. The suggestion that his statements before the coroner were made to the appellants because the State was a party to that proceeding as well as to this, and that witness' testimony at the inquest was a statement to appellants, is too tenuous and fragile for serious consideration. The coroner's inquest was an inquisition, not a case. There were no parties to it. In this case the State is a nominal statutory party, it has no control of the case, is not liable for costs, has no voice in the selection of counsel, receives no benefit if the equitable plaintiffs succeed, and suffers no loss if they fail.

It is suggested too that the witness might properly be examined as to prior inconsistent statements to probe his recollection and to refresh his memory, and there is some support for that contention. *Jones on Evidence* sec. 853; 70 *C. J.* 1025. But the rule in this state is not so broad as that. If a party may, without any showing of entrapment or surprise or that the witness' recollection is faulty or that it needed refreshing, examine his own wit-

ness as to prior inconsistent statements, by the simple device of announcing that the examination is to refresh the witness' memory, the rule that a party cannot impeach his own witness, in the absence of surprise or entrapment, by examining him as to prior inconsistent statements, would be meaningless. Nor is the case of *United States Fidelity & Guaranty Co. v. Continental Baking Co.,* 172 Md. 24, 32, 190 A. 768, any authority for that contention. In that case the plaintiff called for a prior statement made by a witness, and the question there was whether production of the paper on demand put it in evidence. It was held that it did, but that its only effect was to reflect on the credibility of the witness.

Exceptions numbered 3, 4, 6, 7, 15, 18, 20, 21, 22, 23, 27, 28, 31, 50, 52, 53, 54, 55, 56 and 69 were abandoned.

The rulings to which remaining exceptions relating to the admissibility of evidence were noted deal with matters which were collateral or within the discretion of the trial court, or opinion evidence, or immaterial trivialities, and apart from any question as to the form of the exceptions, require no particular discussion. Some of the rulings were doubtful, but the closest scrutiny of them reveals no error which could possibly have injured appellants.

Coming finally to the granting of defendant's demurrer prayers, A and C-1, which present the important question in the case, whether Chenoweth's death was caused by defendant's negligence, it must be assumed that he was killed by an instrumentality in the possession of and under the control of the defendant. It must be assumed too that he was lawfully on the premises, that he had a right to be where he was and that the nature of his duties was such that the defendant was under the same duty to exercise ordinary and reasonable care to avoid injuring him, which it owed to its own servants, agents, and invitees. There were no eyewitnesses of the accident, so that the ultimate question is whether the fact that decedent was killed by an instrumentality under defendant's control, in itself and without more is

sufficient to support an inference that his death resulted from a violation of that duty.

Negligence is not an abstraction. It connotes actual conduct and definite, concrete, facts. It is essentially relative, and is predicated upon the concept that the existence of given facts imposes upon one person the duty of so acting in respect to such facts as not to inflict upon another injury which could be avoided by the exercise of that degree of care and prudence which men of ordinary judgment and prudence may reasonably be expected to exercise in their own affairs under like conditions. *Baltimore, C. & A. R. Co. v. Turner,* 152 Md. 216, 228, 136 A. 609; *Dickey v. Hochschild, Kohn & Co.,* 157 Md. 448, 450, 146 A. 282; *Benedick v. Potts,* 88 Md. 52, 40 A. 1067. Or, as stated in *Jackson v. Pennsylvania R. Co.,* 176 Md. 1, 5, 3 A. 2nd 719, 721: "In order for a plaintiff to have a right of action in negligence against a defendant there must exist a duty which is owed by the defendant to the plaintiff to observe that care which the law prescribes in the given circumstances; a breach by the defendant of that duty; damages and injury suffered by the plaintiff as the demonstrable effect of the breach of duty. Negligence is, therefore, the absence of care according to the circumstances. * * * *Frisch v. Baltimore,* 156 Md. 310, 315, 144 A. 478; *Phelps v. Howard County,* 117 Md. 175, 82 A. 1058; *Neighbors v. Leatherman,* 116 Md. 484, 82 A. 152; *Anne Arundel County v. Carr,* 111 Md. 141, 148, 73 A. 668; *Jeter v. Schwind Quarry Co.,* 97 Md. 696, 699, 55 A. 366; *Walker v. Marye,* 94 Md. 762, 51 A. 1054; *Kennedy v. Cumberland,* 65 Md. 514, 9 A. 234; *Philadelphia, B. & W. R. Co. v. Allen,* 102 Md. 110, 62 A. 245; *Zier v. Chesapeake Beach Rwy. Co.,* 98 Md. 35, 39, 56 A. 385."

The mere fact that injury has occurred is not in itself, and apart from the circumstances under which it occurred, evidence that it was caused by negligence, *Benedick v. Potts, supra.* Nor must such an inference necessarily be drawn from the fact that the injury was caused by some instrumentality under the control of

the person charged with negligence in respect thereto. In theory at least, the administration of the law involves the exercise of reason so as to reach a logical conclusion from an established premise; its sanctions may not rest upon pure conjecture or speculations. So if there are no premises consistent with the existence of negligence, there can be no conclusion that there was negligence. The burden of establishing such premises is upon him who alleges negligence; if he fails to meet that burden, any finding of negligence would be arbitrary and conjectural, with no firmer foundation than emotion, caprice, or whim.

In considering whether an injury was negligently caused, certain factual presumptions may be invoked, such as the known disposition of men not to consciously expose themselves to the danger of death or injury, but while such presumptions may light up proved facts and affect their meaning, they are not substantive evidence, and do not take the place of proof where the law demands proof, and the doctrine ordinarily is applicable to the issue of contributory rather than primary negligence. It has been held that the burden of proving contributory negligence and the rule are interdependent (45 *C. J.* 1151), and that where the burden is on the plaintiff, as in this state (*Kent County v. Pardee,* 151 Md. 68, 77, 134 A. 33; *Evans v. Baltimore, C. & A. Ry.,* 133 Md. 31, 34, 104 A. 112; *Helms'* case, *Baltimore Traction Co. v. Helms,* 84 Md. 515, 36 A. 119), the absence of contributory negligence cannot be presumed but must be proved. 45 *C. J.* 1154. But in *Northern C. R. R. Co. v. Geis,* 31 Md. 357, 364, it was said:

"That a party will act with due care, both with reference to his own safety, and the safety of others, is a natural presumption to be indulged in all cases, until overcome by proof to the contrary. Hence it was not error for the court below to instruct the jury in this case, as was done by granting the third prayer of the plaintiff, that, in considering the question of negligence, it was competent, in connection with all the facts and circum-

stances of the case, to infer the absence of fault on the part of the deceased from the known disposition of men to avoid injury to themselves.

"Objection is taken to the form of the prayer, and to its being liable to misconstruction by the jury. But we must construe it with reference to the facts of the case, and it appears that the evidence was conflicting, tending to create doubt as to whether the deceased was in fault in bringing upon himself his misfortune."

In *Maryland Central R. Co. v. Neubeur,* 62 Md. 391, 402, the court narrowed that general language by this statement: "While it is natural, and as a general rule rational, to presume that a party acts from incentives of self-preservation, this presumption can only be indulged in the absence of proof to the contrary. To instruct the jury that they may, in considering the whole case, 'infer the absence of fault on the part of the plaintiff, from the known disposition of persons to avoid injuries to themselves,' in the presence of testimony that tends strongly to show the existence of fault, is tantamount to instructing them that they may conclude as they please; that they may find upon presumption and put the evidence aside" (*Philadelphia, W. & B. R. Co. v. Stebbing,* 62 Md. 504, 519; *Western Maryland R. Co. v. Shirk,* 95 Md. 637, 53 A. 969), and the rule as thus limited has been applied in such cases. *Lozzi v. Pennsylvania R. Co.,* 152 Md. 508, 137 A. 293, and *Chesapeake & P. Tel. Co. v. Merriken,* 147 Md. 572, 128 A. 277, 41 A. L. R. 763.

Turning now to the facts, with these principles in mind, it appears that the specific acts and ommissions upon which appellants rely to establish negligence are (a) that defendant operated its train of freight cars so as to strike and move other standing cars so that they ran over the decedent, (b) that it ran the train at a fast rate of speed, (c) that it failed to have the train under control, (d) that it failed to have a "proper look out," (e) that it failed to warn the decedent of the approach of the train, and (f) that it failed to provide "sufficient employees" to safely operate the train.

It is obvious that, in respect to the decedent, negligence cannot be inferred from the rate of speed at which defendant operated the train. That concerned only the defendant and the railroad company. The nature of its business required that the weight and speed of the moving train be used to push other cars out of its way. It had so used such trains for many years, and the coal yard was arranged and designed for the very purpose of having them so used. Whether the shock of the collision between the train and the standing cars was violent or gentle was wholly immaterial to any issue in this case. Defendant's business involved shifting trains of heavy, noisy, steel coal cars, and so placing them that they could be hauled away. The business was lawful, as was the manner in which it was operated. There was no duty on the defendant to operate the cars at any particular rate of speed nor to use any particular degree of force in coupling or moving them.

Nor can negligence be inferred from the fact that the moving train was permitted to strike and move the standing cars. That too was an incident of defendant's business, and was apparently the only method used by it to move cars standing in the "empty yard," and that fact was known not only to its employees but to employees of the railroad company who were engaged in inspecting the cars.

The charge that it allowed the train to be out of control must be considered in connection with the charge that it failed to give warning to persons employed on the standing cars of the approach of the train.

It is indubitable, both as a matter of law and of humanity, that if defendant had any reason to anticipate that persons might lawfully be employed in, on, under or about the standing cars, that it was under a duty to warn such persons of any movement of the train which might endanger them. To permit a train of heavy freight cars to smash into standing cars on which men, to its knowledge, might be working, without warning them of the movement, would not only be negligent but would constitute wanton and criminal recklessness.

It is clear too that the manner in which defendant was accustomed to unload and shift the freight cars required some coordination between the work of the car inspectors and the movement of the freight cars, in order that the inspectors could do their work in safety, and that the defendant could unload and shift the cars as its business required.

And the undisputed evidence showed that such a system was adopted. Under it, the imperative duty of workmen employed in inspecting or repairing standing cars was to warn defendant's operatives of their presence by posting conspicuously, at a designated and accustomed place, a warning signal called a "blue flag," and, if no blue flag was available, to notify defendant's foreman or brakeman or the tipple operator of their presence, and they were also accustomed to block the track on which the cars were standing by throwing a switch.

Under that system, if no blue flag was posted, and no warning given by the workmen, the operative moving a train of cars into the "empty yard" was entitled to presume that he had the right of way and that no one would be endangered by the movement. The efficiency of that system depends upon observance of these rules by the car inspectors and the train operative. If they observe the rules, the inspectors could work in safety, and defendant's business carried on without interruption or danger to the inspectors. Accordingly, no provision was made for any whistle, bell, vocal or other sound signal giving warning of movements of the train. The necessity for such a system is obvious when it is considered that the train operative could not possibly see a person who happened to be between standing cars, or even close beside them, and, because of their material and construction, the noise naturally incident to the movement of a train would to some extent at least affect the audibility of any sound signal.

It is also undisputed that at the time of the accident no blue flag was posted, that no warning was given to

defendant's foreman or the operative in charge of the train, that the switch on which the car which ran over decedent was standing was open, and neither that operative or any other employee of defendant knew or had reason to know that the decedent was in, under or near that car.

Under those circumstances, defendant was under no duty to give any warning of the movement of the train, because it was entitled to assume that no one would be endangered by it. So that even if the train was out of control, and there is no evidence that it was, that condition violated no duty which defendant owed the decedent, unless it was bound to anticipate his presence in or about the standing cars. If it was under no such compulsion, the fact that the brake of the moving train was out of order violated no duty which defendant owed the decedent.

In the case of *Louisville & N. R. Co. v. Payne's Adm.* 177 Ky. 462, 197 S. W. 928, where a car inspector was found dead under a car about which he was employed, and where that car had shortly before been shoved several car lengths in a switching operation, it was held that, notwithstanding the "blue flag rule," the defendant was bound to anticipate decedent's presence and warn him of sudden danger created by the movement. That conclusion rested upon a finding that a "great deal of switching was done" in that yard, and that there was "substantial evidence" that the rule was habitually disregarded with the acquiescence of employees superior in authority to the decedent. While the significance of the ruling in that case is not altogether clear, if it means that, where an employer adopts reasonable rules for the protection of his employees, a third person, who relies upon those rules in the operation of its business, is negligent because he does not assume that they will be disregarded, this court is unable to accept it as persuasive authority.

To attempt to analyze the many cases in which the "blue flag rule" has been considered and applied would

needlessly prolong this opinion. Many of them are collected in an elaborate and useful note in 17 *Neg. and Comp. Cas. Ann.* 887. What is certainly the weight of authority supports the conclusion that, where the rule is in force, that it is not negligence to assume that it will be obeyed, but that where it has been adopted and promulgated, but, to the knowledge of the employer and others authorized to rely on it, it has been habitually disregarded, then no one who knows or should know of that situation can invoke it as an excuse for conduct which but for the rule would be negligent.

In this case Thompson testified that he never put out a blue flag when he was going to put a shoe pin in a car, and that that practice had existed in that yard for thirty three years. But he later qualified that statement in this testimony: "It is true to this extent, that there is no trouble getting a key in, if it just drops in, or you just have to tap it, all right, but if it requires work to get under the car or in any such position that would cause any trouble, you would have to put a blue flag up. Q. If you are going to do repairs that require climbing under or crawling under a car, working up under the brakes or under the car, or if you are going to do repairs between two standing cars that are going to take more than a moment or two, it is then required under these rules that you either put out a blue flag, throw the switch or go up and notify the foreman, isn't that correct? * * * A. No, we put the blue flag up on both ends of the track regardless of what anybody tells us, if we have to go in between or under the car."

And James Leo Behr, defendant's foreman, testified that Thompson had told him that "we had access to those tracks in the empty yard at all times unless advised otherwise."

It must be assumed from this testimony that the defendant was justified in assuming that no employee of the railroad company would place himself in a position in which he might be injured by the normal and accustomed movement of cars from the tipple to the "empty

yard" without warning the defendant of his presence there. So unless it is shown that decedent was killed while he was in a position in which he could not be injured except by some abnormal and unusual movement of the train caused by some defect in the cars or fault in their operation, he could not recover. But there is no such proof. Chenoweth's body was found under the cars, no one saw him beside them, Stepnowski, the brakeman, did not see him at all prior to the accident, and it cannot be inferred from the position of his body after the accident that he was standing alongside and not between or under the cars before the accident, for such an inference would be a mere guess which could neither be proved or contradicted.

Under those circumstances defendant was under no duty to anticipate his presence or his danger, and there was no basis for a recovery. *Norfolk & West. R. Co. v. Cofer,* 114 Va. 434, 76 S. E. 909. There was therefore no error in granting defendant's demurrer prayers. The judgment will therefore be affirmed.

*Judgment affirmed, with costs.*