## DAVIDSON TRANSFER & STORAGE CO. *v.* BALTIMORE TRANSIT CO.

[No. 11, April Term, 1944.]

*Decided May 4, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, and BAILEY, JJ.

*Roszel C. Thomsen* and *Clater W. Smith,* with whom were *Clark, Thomsen & Smith* on the brief, for the appellant.

*Wallis Giffen,* with whom was *Philip S. Ball* on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

Appellant instituted this case against appellee, claiming damages to its tractor-trailer caused by appellee's street car when these vehicles collided at a street intersection in Baltimore City. It is averred that the operator of the tractor was entirely free of negligence and the accident was the direct result of the negligence of the appellee's motorman who was operating the street car. The case was submitted to the trial court without a jury, and at the conclusion of the whole case, judgment was rendered for the defendant (appellee) on the ground of contributory negligence. It is from this judgment that the present appeal was taken.

About half past seven on the morning of March 30, 1943, a tractor with a trailer annexed, belonging to The Davidson Transfer and Storage Company, operated by William Bryan, destined to Curtis Bay, was proceeding south on Bond Street in the City of Baltimore. The tractor was 12 feet long and the trailer was 28 feet long. The trailer was loaded with some empty drums and ten tons of pipe fittings. Bond Street, in its approach southerly to Monument Street, is a two and one-half per cent up-grade. The tractor was in third gear, which corresponds to second gear of a touring car. On

the level, when in third gear, it has a speed of about twenty miles an hour. That morning the tractor traveling on Bond Street, upgrade, approaching Monument Street to the south, was traveling about ten miles an hour. As it approached Monument Street there was an automobile facing south, parked at the west curb of Bond Street, about eight feet north of the north curb of Monument Street. Rudy Shaw was the driver of this car. His employer was seated in it and he was standing at the curb, at about the windshield of the automobile, with the right door of the car open, about to get in and drive his employer to his office. He had a perfect view easterly down Monument Street to Broadway. He saw the tractor approaching and as it was near him he waited for it to pass. He saw the accident and his description of how it happened is about as follows: When he first saw the tractor-trailer it was about fifteen feet north of his employer's automobile, traveling about eight or ten miles an hour. At that time, the witness stated, the street car was not coming. As the tractor passed him it was to the right of the center of the street. When it reached a point where its hood projected about six feet into Monument Street he looked over the hood of the tractor and saw the street car coming west, crossing over Bethel Street, traveling about thirty miles an hour. From the center of Bethel Street westerly to the center of Bond Street is 245 feet. "The cab just got across the first rail, the streetcar was in, I say, fifty feet of it. As the truck got center the track, going about center, the street car ran right into the center of the truck, I will say, about near the center." On cross-examination the witness gave this version of the accident: "The street car was about, when the cab entered over just about the first rail, going west on Monument the street car was coming over Bethel Street, and the cab was hitting the eastbound rail—When the cab hit the eastbound rail, why, that threw the street car about fifty feet to it, to the trailer. The trailer is just half way across, the trailer gets about even, the center of the trailer gets

about even with the eastbound rail, the street car ran right into the side of it, and that knocks the cab cater-cornered up Monument, up the street and knocks the rear end of the trailer down." It was after the trailer passed, the witness saw the street car fifty feet from the trailer.

Addison Warren testified he was walking west on the north side of Monument Street and when he reached the west curb of Bethel Street he saw a street car. It was making a terrific noise. He turned and looked and by that time the car was beside him; "so, I followed the general direction of the street car, and that's when I saw the first unit of the truck and trailer going across." At that time the front wheels of the tractor were about midway between the two tracks of the westbound rails, and then "I noticed the street car was running at a ter-rific rate of speed, I didn't expect it to stop. I was con-tinuing walking, and I did notice during that time the motorman made every effort. He applied the brakes and put sand under the wheels, but the street car just continued sliding right straight down the street, and by that time the front of the tractor-trailer had gotten across to the other track of the eastbound run." "The rear trailer wheel was just about center of the west-bound run when the actual contact came between the two vehicles." It "upset the trailer, and then I hurried up and ran across the street behind the street car and went over to the cab to see how the fellow was in the cab, and helped him to get out." At that time the trailer was turned over on its right side, the rear wheels were on the south rail of the westbound tracks. The witness estimated that the motorman applied sand in order to stop the car 100 feet from Bond Street; that the sand and brakes were applied shortly after the street car passed him at Bethel Street. He did not hear the bell on the street car ring.

William Bryan, at the time of the accident, had been working for the appellant for a year and eight months and had been driving tractor and trailer units for ten

years. When he came to the intersection of Monument and Bond Streets he "couldn't see, didn't see anything coming or going either way so, as I pulled out in the intersection I looked and saw the street car coming. By that time the front of my tractor was in the car track of the westbound street car, so I continued on across because the street car was up there so far I just say, well, being that far, I will be across before he hit me." He further stated that the front of the tractor was just about in the westbound tracks when he first saw the street car and it was at that time close to Bethel Street, and when the streetcar struck the trailer the tractor was just about at the building line, meaning the building line on the south side of Monument Street. He stated: "As I was going across Bond Street, I didn't think the street car would hit me. I got so far out and all of a sudden I heard something go bump, and just as soon at it hit the whole think went over." The street car struck the trailer about four feet back from the center. The tractor-trailer was traveling at about ten miles an hour at the time and due to the heavy load the witness stated he could not pick up in speed. On cross-examination he said: "When I got to the intersection it wasn't nothing coming or going, no automobiles or street car or anything." When asked: "Where was the front of your tractor when you looked that first time and couldn't see anything?" he answered: "I was just about at the building line." "When I first seen the street car I was at the building line but the tractor stood out in front of me about six feet." Question: "Well, didn't you look for the street car when you yourself got to the building line?" He answered: "I looked for street cars, other automobiles, anything, when I got to the building line, but I didn't see anything," and he saw the street car the first time when the front of the trailer was on the car tracks. "When I seen the street car my tractor wheels was in the street car tracks." He stated that due to the upgrade and the heavy load he could not increase his speed. He further

stated that going ten miles an hour he could stop within two feet.

The damage resulting from this accident is not disputed and the testimony relating thereto need not be considered.

From this evidence it appears that the witness Bryan was driving this tractor with the trailer attached, heavily loaded, upgrade, on Bond Street. When he arrived at the building line and had a partial view east on Monument Street, he looked and saw no traffic approaching. The cab in which he was sitting was some five to six feet from the front of the tractor. He proceeded, at ten miles an hour, to cross the intersection, and when the front of the tractor was in the westbound street car tracks he saw the street car for the first time. It was then near Bethel Street, approximately 245 feet east. It further appears that the street car was being operated, down a 5 per cent. grade, at a high rate of speed and when it was about 100 feet east of Bond Street, in an effort to slow down the speed, the motorman released sand for an approximated distance of 100 feet, and applied the brakes, but, nevertheless, the momentum of the street car was such that it hit the rear end of the trailer.

These facts make out a prima facie case of negligence on the part of the motorman in the operation of the street car. There was evidence tending to show that the street car was operated at an excessive rate of speed, which directly contributed to the accident. To determine whether or not the operator of the tractor was guilty of contributory negligence it was necessary that all the facts and circumstances attending this accident be considered, and it cannot be said, from this evidence, that the operator of the tractor was guilty of such conduct so distinct, prominent and decisive that ordinary minds would not differ in declaring it to be negligent. The appellant's evidence, therefore, was legally sufficient to be submitted to a jury, if this case had been tried before a jury. *United Rys. & Electric Co. v. Ward,* 113 Md. 649, 77 A.

593; *United Rys. & Electric Co. v. Watkins,* 102 Md. 264, 267, 62 A. 234; *Schell v. United Rys. & Elec. Co.,* 144 Md. 527, 125 A. 158; *Taxicab Co. v. Ottenritter,* 151 Md. 525, 135 A. 587; *Jersey Ice Cream Co. v. Bach,* 161 Md. 285, 157 A. 277; *United Rys. & E. Co. v. Mantik,* 127 Md. 197, 96 A. 261.

On the question of contributory negligence as a matter of law, the facts in the case of *Foos v United Railways & Electric Co.,* 136 Md. 540, 541, 110 A. 849, and the case of *Colgate & Co. v. United Railways & Electric Co.,* 156 Md. 472, 144 A. 519, are so different from the facts involved in this case that they are not in point.

This brings us to a consideration of the evidence of the appellee. The witness Crouse was the motorman operating the car at the time of the accident. His testimony may be summarized as follows: He brought his car to a stop at Broadway. On Monument Street two large blocks extend west from Broadway to Caroline Street. Between Broadway and Bond is Bethel Street, which is a narrow street at which street cars do not stop, and Bond Street, which is between Broadway and Caroline Street, is a skip stop street, that is, street cars do not stop there to discharge or take on passengers. There is a five per cent. downgrade to Caroline Street. The street car could have drifted all the way down, without the motorman applying the current, "at a pretty fair speed". When he "came down from Broadway" he said: "I just don't know how fast I was going but moderate." At Bethel Street he checked the speed some and rang the bell. At that time he put the current on and "I just had started to start again from being slowed up when I got to the building line." At that time the car was traveling between ten and fifteen miles per hour. When the front of the street car was south of the east building line on Bond Street, the motorman said he could not see the tractor-trailer, although Bond Street, as it intersects Monument Street at the north side thereof, is 41 feet 10 inches in width from curb to curb and the east sidewalk on Bond Street is 14 feet wide, from curb to the

building line. It would seem at that time the motorman could have seen down Bond Street farther than the building line on Monument Street. He states at that time he could not see the tractor-trailer. He further stated that he slowed up at Bond Street and didn't see anything there and he "threw it around against the post to go on down," meaning that he turned on the current. When he saw the truck (meaning the tractor) it was at the building line (north building line) of Monument Street. Question: "You say you did not observe this truck (meaning tractor) at all until you got to the building line on Bond Street?" Answer: "Well, I couldn't see it around the corner. You have to wait until I got down to the corner to see it." "I didn't see it until I got down so I could see it." Question: "Well, if the truck was back of the building line and you were at the building line, why did you throw your street car in emergency and throw sand at that point?" Answer: "I thought he was going to do something like that, like he did, cut in front of me, and I started stopping again." After the accident the back wheel of the truck (meaning the tractor) was on the eastbound tracks and part of the trailer was "sticking out beyond that." The tractor-trailer was knocked over on its right side. It thus appears from this evidence that when the street car came to Bethel Street its speed was slackened. It picked up some speed as it approached Bond Street, when current was again applied. At the building line the motorman did not see the tractor-trailer, although if he had looked to his right it is highly probable that he could have seen it before it arrived at the building line on Monument Street. He says that when he "spied" the truck he threw sand, rang the gong and applied the brakes all at the same time and "before I knew it he was right across in front of me because he was going fast."

Frank Shiner testified he was sitting on the right side of the street car, about in the center. The front end of the street car was about at the corner when he first saw the truck. He was asked, on direct examination: "Well,

at that time where was the front of the tractor with respect to the north side of Monument Street?" And he answered: "A pretty good, I might say a right good distance past the center of the street." The next question was: "What?" A. "The tractor—" Q. "No, the tractor, the motor truck—where was the front of the motor truck with respect to the north side of Monument Street, when you first saw—where was the front of the motor truck with respect to the north side of Monument Street when you first saw it?" To which he answered: "Well, now, I was in the center of the street car, and, of course, if I had been up front I could have saw more but being in the center, I just about got a glimpse of it." Later on this witness materially changed his testimony. The fact that this witness was called by the defendant, if his evidence is entitled to any weight it would tend to corroborate the testimony produced by the plaintiff. He was not a very impressive witness.

Florence Shawker was sitting in the second seat from the front, on the left side of the street car. She remembers that the motorman was very "careful traveling" and that she felt the slowing down of the car when nearing Bond Street. Of this she definitely took notice. She cannot remember whether the motorman rang the bell. The street car was about at the northeast building line of Bond Street when she first saw the tractor which was at that time at "about the building line of Monument and Bond, the north". She said: "I wouldn't say it was going too fast; I mean, not too fast for comfort to me, but I knew it was coming and I also think it picked up a little speed, after he started across Monument Street probably to clear the track." Q. "Was there any sounding of the bell?" A. "I couldn't remember now whether it was, most likely it was, because I wasn't uncomfortable." When asked where the collision occurred with respect to the center of the intersection, she answered: "Well, I wouldn't know about that. I just picked out the part of the trailer we were going to hit, and we hit it about where I put it." The trailer was hit, she said, between the center and the back.

James Quinn stated that he was a passenger on the street car and that after the car left Broadway the motorman was coming downhill and was ringing his bell and was doing everything a motorman should do. He was "going regular." The Court asked the question: "Well, if he was not going fast why was he ringing his bell?" His answer was: "He kept ringing it." When asked the question: "Well, did you see this truck before the accident happened?" He answered: "That truck came out of Bond Street just like a flash, a vision like, and all of a sudden it crashed." The street car was about three feet east of the Bond Street building line when he first saw the tractor-trailer. He stated he guessed that the street car was traveling at about ten miles an hour at the time. When asked: "Well, where was the truck when you first saw it with respect to the street car?" he answered: "Well, now, she bounded out so fast from Bond Street that I just couldn't tell you how close it was. It really came out like a flash." When asked the question: "Had the tractor gotten on to the street car tracks when you first saw it or was it north of the track?" he answered: "He came out awful quick, sir." So that, according to this witness, when the street car was three feet east of Bond Street, this heavily laden trailer, drawn by this tractor, upgrade, "flashed" out in front of the street car. Where the tractor was when the street car was three feet east of Bond Street he does not appear to know. It is sufficient to say that the description given by this witness of how this accident occurred is highly improbable.

Agnes McCord was a passenger on the street car. She said it "wasn't going very fast" and she didn't recall hearing the motorman ring the bell. She said: "Just as we reached the building line on the northeast, I saw the truck coming out of Bond Street." "The street car motorman then applied his brakes to stop the car, the street car, and the truck kept on going. It didn't make any effort to stop. It was going at a pretty fast speed," and it seemed to her it was going faster than the street car was

going before the motorman applied the brake. She further testified when the motorman saw the truck, that is, when he applied his brakes, he saw it almost the same time she did. "I was right in front of the car." She further stated that when she first saw the truck it was "right at the north building line when I saw it." She testified that the front part of the truck (meaning tractor) was at the building line when she saw it.

The testimony of the photographer and of the police officer who arrived after the accident need not be considered.

We have carefully considered all of the testimony produced in this case in connection with primary and contributory negligence. The preponderance of the evidence tends to show that this street car was traveling downgrade at a high rate of speed, which was the direct and proximate cause of this accident. Almost all of the witnesses testified when they first saw the front end of the tractor it was even with the building line of Monument Street. It is uncontradicted that the trailer was heavily laden and that it was going a little upgrade. Its operator stated that by reason of the load and the grade the tractor could not pick up speed and it was moving about ten miles an hour as it approached the intersection. He could have stopped it within two feet. It seems highly improbable that under such circumstances he should attempt to cut in front of a fast moving street car, and it is improbable that the tractor was moving faster than the street car was before the motorman applied the brakes. It is hard to believe that the tractor-trailer came out into Monument Street like a "flash".

"Effect has been given to the known disposition of men to act prudently to avoid danger and thus are entitled to the presumption that they did act with due care."

"Before the victim of the accident can be judicially declared to have been guilty of contributory negligence, we must give due consideration not only to all inferences of fact tending to support the opposite view, but also to the important presumption that he exercised ordinary care for his own safety."

274

"In Maryland the law is well established that the burden of proving contributory negligence is on the defendant. There is no burden on the plaintiff to free himself from the charge of contributory negligence."

*Sheriff Motor Co. v. State*, 169 Md. 79, 84, 179 A. 508, 511.

We conclude that primary negligence was established by the plaintiff; that the defendant failed to meet the burden of proof which was on it to show that the operator of the tractor was guilty of negligence directly contributing to the accident.

> *Judgment reversed, judgment entered in favor of appellant against the appellee for $1,011.03, with costs.*