Anna JENNINGS, administratrix of Stewart Earl Jennings, deceased

v.

UNITED STATES.

STATE of Maryland to use of Anna JENNINGS, surviving wife, Anna Frances Jennings, a minor, Russel Earl Jennings, a minor, Gregory Stewart Jennings, a minor, and the unborn child or children, enventre sa mère, of Stewart Jennings

v.

UNITED STATES.

Margaret M. JENNINGS in her own right as mother and next friend of Donald S. Jennings and Donald S. Jennings in his right

v.

UNITED STATES.
Civ. A. Nos. 9063, 9064, 9313.

United States District Court
D. Maryland.
Nov. 10, 1959.

Defendant's Motion for New Trial Overruled Dec. 22, 1959.

518

Hugh Lynch, Jr., (Macleay, Lynch & McDonald), John J. Pyne, Washington, D. C., John H. Bolgiano (Clark, Smith & Prendergast), Baltimore, Md., Paul R. Connolly, Jr., and Jeremiah C. Collins (Hogan & Hartson), and George A. Chadwick, Jr., Washington, D. C. (Frost & Towers), Washington, D. C., for plaintiffs.

Leon H. A. Pierson, U. S. Atty., and Martin A. Ferris, Asst. U. S. Atty., Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

On Monday, January 23, 1956, at approximately 7:30 a. m., an automobile operated by Stewart Earl Jennings (Stewart) in which his brother, Donald S. Jennings (Donald) was a passenger, was involved in a collision on Suitland Parkway, property of the United States, and under the control of the National Capitol Park Bureau, Department of the Interior. Stewart was killed, and Donald sustained serious and permanent injuries. On the claim of alleged negligence of the United States, three suits have been filed under the Federal Tort Claims Act, United States Code, Title 28, § 1346(b).

In Civil Action No. 9063 the Administratrix of the estate of Stewart Earl Jennings sues to recover under Maryland Code of Public General Laws (1951) Article 93, § 111,[1] for Stewart's alleged conscious pain and suffering; for total loss of Stewart's automobile; and for funeral and burial expenses. (Administratrix's suit.)

In Civil Action No. 9064, suit is brought in the name of the State of Maryland to the use of Stewart's widow and four children (including a posthumous child), under Maryland Code of Public General Laws (1951)[2] Article 67, § 1 et seq. (the Maryland Lord Campbell's Act) for damages for alleged wrongful death of Stewart. (Death suit.)

In Civil Action No. 9313, Margaret M. Jennings, in her own right, and as mother and next friend of Donald S. Jennings, sues for loss of Donald's services, and to recover for Donald's pain, suffering, permanent disability, and medical and hospital expenses. At the time of trial Donald had become of age, and pursuant to oral motion and order, the suit has been entered to the use of Margaret M. Jennings and Donald S. Jennings, as their interests may appear. (Donald's suit.)

Questions of primary negligence, contributory negligence, and measure and amount of damages are presented. While the decision of the court in accordance with this opinion will manifestly represent the court's belief as to the correct solution of the problems, the probability of disagreement by one or both sides with some or all of the decision, and the possibility (remote as the court devoutly believes it to be) of some disagreement, on appeal, with the court's decision, leads the court to a somewhat detailed treatment of the voluminous evidence (the trial lasted ten days) and an effort to pass upon all points; with the hope that, if error be found, it can be corrected on appeal without remanding for a new trial.

### The Problem of Liability

The plaintiffs claim that as Stewart was driving in a westerly[3] direction on Suitland Parkway, having left his home on Forestville Road, and was proceeding toward his place of employment, at the Naval Gun Factory in Washington, D. C., as a result of an accumulation of ice on the travelled portion of the road about seven-tenths of a mile west of the intersection of Forestville Road with Suitland Parkway, his automobile skidded out of control and collided in the eastbound lane with an automobile being driven in an easterly direction on Suitland Parkway.

Suitland Parkway stretches from South Capitol Street Bridge in Washington, D.

---

1. Counsel in their briefs have erroneously referred to Article 93, § 112 of the 1956 code. There is no 1956 code and although the successor section to § *111* of the 1951 Code is § *112* of the 1957 code, the latter section having been amended subsequent to the accrual of the administratrix's cause of action and institution of this suit, the section as amended is not applicable as will hereinafter be more fully discussed.

2. Again although plaintiff's counsel erroneously refer to the 1956 code; the court's reference will be to the 1951 code.

3. For simplification, it was assumed in the case that Suitland Parkway runs generally east and west—towards Andrews Air Base and Washington, respectively.

C. to Andrews Air Base in Maryland, a distance of approximately nine miles. Suitland Parkway was originally opened in December 1944 as a military highway for the United States Army Engineers. It was designed for a dual highway, but only a portion, at the Washington, D. C. end has been completed. The road involved is a two-lane highway, with no center strip, the lanes being twelve feet wide, of concrete construction, with concrete curbs three inches high and six inches wide. At and near the vicinity in question, the road curves slightly; has about a one inch crown, and slopes slightly from north to south, and runs through a slight cut, with trees on both sides. About six to eight feet off the road on the north side there is a "swale" or slightly depressed drainage ditch through sod at the foot of a bank, designed to drain into a field ditch. Along the curbing on each side of the highway are curb drains; but as the road slope is from north to south, there is no north curb drain within some 1,500 feet of the critical point. On the south side, curb drains are located at a distance of about 300 feet apart within this area.

Plaintiffs' theories are that the United States negligently caused or permitted ice to accumulate in a dangerous location on the highway, and that thereafter, with actual knowledge or constructive notice of such ice and of the danger thereby created, failed to use reasonable care to eliminate such dangers by sanding or salting or to give notice of the condition by signs, flares, or other warnings.

Plaintiffs in their complaints attributed the collection of ice in the location in question to poor drainage, particularly in an area shaded by banks and trees. One of the specific claims was that the highway, together with its adjacent and adjoining drainage and landscaping, was negligently constructed.

This was discussed at a pretrial conference held at the end of 1957, in which the Government was given thirty days to state whether or not it would claim that questions of "construction" of the highway, as distinguished from maintenance and patrol, fell within the discretionary exceptions of the Federal Tort Claims Act. No formal statement of position by the Government was made, and no memorandum was filed. To avoid any problems arising sub silentio, at the last pretrial conference before trial, in July 1959, this aspect was discussed, and the pretrial order reads, with respect thereto:

"(4) The Government makes no claim that it is immune in these cases on the ground that the alleged negligent conduct falls within the discretionary exceptions of the Federal Tort Claims Act."

On the third day of the trial a Government witness, called by the plaintiffs, was interrogated by plaintiffs' counsel as to certain matters relating to original drainage grades, and as to answers to interrogatories relating to work done after the accident. The court thought that these were primarily intended to lay a foundation for showing that the final contours would ordinarily lead to water drainage across the road in heavy rains or melting snows, with the possibility or probability of freezing (or failing to melt) in the shielded, protected area in question. On resumption of the trial on the fourth day, the United States Attorney for the District of Maryland, with understandable reluctance, stated that he had been instructed to interpose the defense of discretionary conduct to any questions relating to original or present construction. This presented several serious questions, such as whether under United States Code, Title 28, § 2680(a), the absence of a nondiscretionary function was jurisdictional and hence could not be waived; whether, under Indian Towing Co., Inc. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed. 2d 354; Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631, and Hernandez v. United States, D.C.D. Hawaii 1953, 112 F.Supp. 369, the conduct in question would fall within the ambit of the Tort Claims Act; and

whether under the applicable Maryland law, the lack of care and skill in designing the road was "so great as to constitute negligence." Mayor and City Council of Cumberland v. Turney, 1939, 177 Md. 297, 310–311, 9 A.2d 561, 567. At the end of the case the court was, and after a review of all the evidence still is, of the conviction that the evidence as to original construction and present condition of the highway and its approaches was intended, and was admissible, only to indicate the probability of icing at the point in question, the consequent obligation of the Government to anticipate this probability;[4] and as showing that the affirmative testimony as to the presence of ice on this and other occasions was not completely implausible despite the testimony of highway patrolmen who did not observe icing at this point at the time in question, or at any time when icing was not generally prevalent on the entire highway.

Plaintiffs' counsel accepted the court's position and construction as to the purpose and evidentiary value of this evidence, and in the closing argument expressly stated that liability was not being claimed on any theory of negligent design or construction, but upon actual knowledge or constructive notice of the icy condition, and negligent failure to warn or remove. The court will accordingly, in accordance with its construction and ruling, and plaintiffs' concession, consider primary negligence from these aspects.

(a) Constructive notice, generally.

A heavy snow had fallen on the Thursday preceding Monday, January 23, 1956. The highway had been sanded at about midnight Thursday from a point several miles west to Allentown Road on the east of the point involved. The highway had also been scraped of snow, which was pushed off to the sides. The concrete curbs prevented the snow from being pushed back off the road onto the shoulders. At about 10 p. m. on January

22, 1956, the Washington temperature was 38 degrees; at 5 a. m. on January 23, 1956, at the same place, it was 36 degrees. No temperatures are recorded for the particular spot where the accident occurred.

Suitland Parkway since its opening in December 1944 has been under twenty-four-hour radio police car patrol. On snowfalls of under two inches, sand and calcium carbonate (rather than common salt) are spread. Snow plows are used to clear the roadway if the fall exceeds two inches.

The patrol cars are equipped with two-way radios. Patrolmen are supposed to call for sanding or the use of snow plows if they believe conditions warrant, and have not been advised that such protection will be routinely provided. In addition, they are supposed to call for the sanding of any isolated spot or spots they consider dangerous. Supervisory and work personnel are available twenty-four hours a day, seven days a week, to respond to such calls. There is no record of any such call from midnight of January 20, 1956 until after the accident.

At the time of construction, the high point of the land immediately adjacent on the north was at or within twelve inches of the curb, and then sloped back very gently (from 0.07 feet in 11.5 feet near the scene of the accident to a maximum of 0.65 feet in 7.5 feet) to the swale, some six feet to the north.

Photographs taken within a few hours of the accident show substantial accumulations of snow on the northern slopes.

There was adequate direct, positive, and credible testimony to prove that under these conditions the location at which the accident occurred was a "danger spot"; that because of the very slight (about 0.5 per cent) grade east-west of the highway, and the slight slope from north to south, water from heavy rains or melting snows would tend to settle initially on the westbound track; and

4. The effect of general knowledge, if proved, upon the question of contributory negligence is considered under that topic.

because of its shaded, sheltered condition, such water would freeze, or remain frozen, when the balance of the highway[5] would be clear. This is summarized in the accompanying footnote.[6] Testimony was offered for the Government, by a number of police patrolling the parkway at various periods, and by supervisory personnel,[7] which with one exception[8] was that the spot in question was no different from the highway in general; that is, if the highway in general was icy, so was this spot; if the highway was clear, so was this spot; that it presented no particular problem.

While the court accepts the good faith of the Government employees who testified (although a number of officers who at various times had patrolled the highway were not called[9]), it feels that affirmative testimony, by ordinary travellers, of the observance of specific physical conditions is more persuasive than that of persons patrolling a nine-mile stretch with no particular reasons to note a negative. Moreover, at least two witnesses, one of them the chief of a volunteer rescue squad, testified to having previously given notice of ice in this location.

The court is mindful of the fact that during the preceding two years no accident had occurred in this location. Under the topic of contributory negligence, the near occurrence of an accident just before the one involving Stewart and Donald will be noted.

■ The court accordingly determines from the weight of the evidence that under the physical conditions existing on the morning of January 23, 1956 —falling temperatures after a snowfall, scraping of the highway, and thaw—the Government was charged with knowledge that an icy condition might well exist at the point in question, and that if it did exist, it would be a source of danger to users of the highway if safety precautions such as sand, salt, or warnings were not employed.

5. Except at the underpass at Stanton Road, miles from the location in question, and at an overpass, likewise nowhere in the vicinity involved.

6. Wirth had travelled the road for two to three years before accident; the ice at this spot was more on the north side, covering all the westbound lane. Suthard had travelled the road three or more times a winter. Carey travelled frequently since 1945. Pumphrey had travelled the road four to five years, noticed ice in the "vicinity". Mintz had travelled the road since 1955; ice here "more than at any other place." Madison had travelled the road 1947–1950 and 1954 to date of accident. Crickard had travelled the road since May 30, 1952; knew the area, and was always careful; this place always the worst. Middleton had travelled the road six years. Carr had travelled the road four years as a postal truck driver; this the only bad place; ice whenever the weather was cold, particularly if there had been rain or snow within the past few days.

7. Robey, Assistant Chief, Horticultural Branch of National Capitol Parks Service, including Suitland Parkway; no trouble in this area, except when general trouble over whole Parkway. Hayes, United States Park Police [hereinafter, "patrolman"] four years; this place did not require special attention. Love, patrolman, six years. Lang, sergeant; 1946–1950. Supulbeda, patrolman, 1946–1950. Dougherty, patrolman, parts of 1950, 1951, 1953. Street, patrolman, December 1954 and February and December 1955. Stevens, patrolman, parts of 1950 and 1951, all of 1952. Maintenance, four years before May 25, 1955. Howell, sergeant, parts of 1952, 1953 and 1954. McCall, patrolman, one month in 1951, one month in 1952, four months in 1953, four months in 1954, and all of 1955. Proctor, twelve years laborer along the sides of roads, including Suitland Parkway. Rollins, Safety Inspector since March 29, 1954, made periodic inspections three to four times a year.

8. Fattibene, patrolman, 1953–1954. Spots at scene of accident take longest time to dry up, and in freezing weather ice will form.

9. No strong inference should be drawn from this. To call everyone who had ever patrolled the highway for no matter how short a period, would have greatly prolonged the trial; and their memories of generalities, after the lapse of years, would scarcely have been reliable. Moreover, plaintiffs were given a list of such persons, and could by pretrial discovery have sought out any weak links.

(b) Constructive notice or actual knowledge on January 23, 1956.

The testimony of eyewitnesses in vehicles traveling eastwardly on January 23, including occupants of the vehicle in collision with Stewart's auto, and the two following eastward-bound cars, fix Stewart's speed at 40–50 miles per hour.[10] At a point approximately seven-tenths of a mile west of Forestville Road, at a point where the highway runs through a small cut, Stewart's car encountered ice, skidded to the right, straightened up, skidded to the left [11] and came across the westbound lane into the eastbound lane, where the right front of Stewart's auto collided with the left front of Porter's eastbound auto.

■ There is satisfactory and credible evidence from which the court finds that ice was present, at the location where Stewart skidded, from approximately 10 p. m. on January 22, 1956 to the time of the collision at about 7:30 a. m. on January 23, 1956. As this question is so critical, an analysis will be made in the text of the opinion, rather than in footnotes. In each case, unless otherwise noted, the witness attempted to identify the place in which he was involved as the point at which Stewart encountered ice.

Castiglioni, westbound toward Washington, between 10 and 11 p. m. on January 22, 1956, saw a patch of ice on the road, slowed down, and felt his rear wheels slip as he safely passed over.

Officer Moskaitis who lived on Forestville Road next door to the Jennings' and who patrolled Suitland Parkway from 11 p. m. January 22 to 7 p. m. January 23, was driving westbound to report for work, having left his home between 10:10 and 10:30 p. m. On the way, he felt his wheels spin as they passed over ice. He could not identify the exact places, but because of this experience, he was particularly observant on his first round trip over Suitland Parkway, but did not notice any ice, or any condition that caused him to stop or call for sand. He with Officer Hayes patrolled the Highway that night, and probably made five, six or seven round trips from end to end, (which would mean passing to the south of the spot in question on each eastbound trip, and driving over the spot on each westbound trip), during none of which was ice noted at or near the spot in question.[12] However, on Moskaitis' return homeward, eastbound, after duty, he did see "slushy ice" at this point at about 7:30 a. m. William H. Carey (a half-brother of Anna Jennings) on his way eastbound at about midnight struck an icy spot and turned off into the grass shoulder, but regained control. Jayne Snipes, riding with Evelyn Carey (sister of Anna Jennings) eastbound to the Jennings' home at 3–3:30 p. m. January 22, noticed water on the road. On their return about midnight, the auto skidded on what "looked like water." Miss Carey's testimony was that on the return westbound trip they approached what looked

---

10. The court, if at liberty to do so, would be inclined to question the ability of the average motorist to approximate with any reasonable degree of accuracy the speed in miles per hour, of a vehicle directly approaching. This is discussed under the section on contributory negligence.

11. Testimony of Booth, driver of the auto behind Porter. Porter testified that the first skid was almost to the center lane; that Stewart's car straightened on his (Stewart's) side of the lane, then skidded again across the center line, and collided with Porter's car. Wirth, a passenger in Porter's car, testified that he saw Stewart's car start to skid, and

that it continued sliding sideways until the collision.

12. Hayes, who accompanied Moskaitis on the 11 p.m.–7 a.m. tour, and who probably drove the second four hours, likewise testified that he noticed no ice during the tour of duty. Hayes impressed the court as a very honest, capable and intelligent witness. His testimony may possibly be explained on the basis that he experienced no sensation of slipping. The court does not feel that this testimony can overcome the very substantial affirmative testimony, later summarized, as to the existence of ice from about 6 a.m. on.

like water; she applied her brakes, and the rear slid from right to left on what she "knew" was ice.

Vigue, who lived in Forestville and normally reported for work in Washington, D. C. at 8 a. m., left home early on January 23 because his group was shorthanded. Between 5:45 and 6 a. m. while westbound the rear of his auto swayed; he then encountered "another stretch of ice" on which he had a slight skid. Miller driving west at 6 a. m. felt his car slip a little going over ice, but did not lose control. On his return eastbound at 6:45 a. m., he noticed ice on both lanes. Mintz, leaving home in Forestville at 6:20 a. m. was expecting ice, and so was driving at thirty miles per hour, but still did not see it until he got on it, when he slid about thirty yards before regaining control. Pumphrey westbound on Suitland at about 6:50 a. m. ran up on ice, threw his brakes on, and slid two car lengths to the left, just a little into the eastbound lane. Madison, westbound, at about 7 a. m. "hit" some ice but did not slide.

Suthard, eastbound at 7–7:15 a. m., saw a westbound auto skid on ice all the way across the road in front of him. Middleton, westbound at 7:10–7:15 a. m. went over one ice patch, then a smaller one, and noticed streaks of ice between the two, which he believed were from auto tires. Humphries, riding with Middleton, saw one patch of ice, and did not notice any "frozen tracks."

Crickard, who arrived shortly after the accident, while westbound saw ice on both lanes. Porter, driver of the eastbound vehicle, with which Stewart's automobile collided, after the accident walked around in front of the cars and saw slush and ice in the westbound lane. Moskaitis, off duty, and arriving very shortly after the collision, saw "slushy ice" in the westbound lane. Booth, driver of the eastbound vehicle immediately behind Porter, saw ice in the westbound lane, to the east of where the collision vehicles came to rest. Carr, driver of a three-ton postal truck, was following Booth. Carr did not note the condition of the westbound lane at that time, but did feel the wheels of his truck slip as he drove past. On his return trip westbound, he arrived at the accident scene about 8:10 a. m. at which time he saw hard, glazed ice on the westbound lane from the curb almost to the center of the highway. Glaubitz, chief of a volunteer rescue squad, and driver of the ambulance that took Stewart to the hospital, arrived shortly before 8. a. m. He then observed a "pretty good patch of ice" mostly in the westbound lane, but some in the eastbound lane.

Officer Love, who was a Park Police patrolman, and who had done some investigation work on property damage cases, was assigned to investigate the casualty in question. In this he was assisted by Officer Bragg of the Park Police, who was in the Accident Investigation Division. Love arrived at the scene about 7:45 a. m., before the injured had been removed. His first efforts were— properly—to assist the injured and to unsnarl traffic. Shortly after 8 a. m. Love and Bragg made measurements. Love testified that to the east of the damaged vehicles the road was wet; and at a point which he fixed as 212 feet diagonally from the point of impact in the eastbound lane, there was some "slushy ice" in the westbound lane, about twenty (or twenty-five) feet long and 8–10 feet wide. These locations are indicated on a plat which he testified, and the court finds, was prepared on the spot from notes of measurements just made. He also testified that there was water on the road between the collision cars and the ice.[13] His standard form of acci-

---

13. Some difficulty arises from language in Love's deposition as to the condition of the road between the cars and the icy patch, whether slushy or hard. The court construes the totality of his testimony, deposition and oral, as above indicated; and concludes that his reference to ice "along the road" had reference to ice and snow along the curb, extending into the road not more than one foot at the most.

dent report had a check mark in the blocking opposite "icy", the alternate-choice word "snowy" having been stricken by him; and road conditions were marked "slippery."

Bragg corroborated the 212 foot measurement. In his signed statement, given January 29, 1957, he referred to the ice as being "slushy", twenty-five feet long and six to eight feet wide. In court, he testified the ice was sixty feet long, more or less, three to three and one-half feet wide, and "slick." He did not recall the condition of the road between the point of impact and the ice.

As to the size of the ice patch (or patches), the evidence on behalf of the plaintiffs was quite inconsistent. The various estimates were 10 to 15 to 30 feet (Castiglione); 25 feet (Love; his diagram; Bragg's signed statement); 25–30 feet, or 30–45 feet for the first patch and 40–75 feet or 90–150 feet for the second, or one entire stretch of 150–300 feet (Vigue); 25–30 feet (Suthard); 50 feet (Pumphrey); 50 feet (or 25 feet according to his signed statement—Madison); 3–4 car lengths (Glaubitz); 25 feet (Bragg's signed statement and contemporaneous measurement) or approximately 60 feet (Bragg's testimony at the trial); a 400 foot parallelogram (Crickard); 125–150 feet (Middleton); 60–80 feet (Humphries); 20–25 feet (Booth); and 2–3 car lengths (Carr); one and one-half car lengths, at midnight (Evelyn Carey).

Also, the tape at headquarters of radio messages discloses the report at 7:34 a. m. of an accident on ice on the Suitland Parkway; and a call by Love for sand.

To be contrasted with this is the testimony on behalf of the Government as to the absence of ice shortly after the accident. Thorne, Assistant Superintendent of the East Section (Suitland Parkway) for National Capitol Park Bureau since December 1, 1955 testified that he arrived on the scene one-half hour after the accident (although he did not know the clock time he arrived, and could not correlate it with the 8:50 a. m. call for sand) at which time he saw no ice on the travelled portion of the road, although the road was wet. His conclusion as to time was based upon his recollection that upon reaching his deck at 7:30 a. m. he was told that there had been an accident and he was to take the sander; that he started at once, and that it took 20–25 minutes to get the sand there. Although testifying that he found no ice he ordered the road sanded from the point of impact eastwardly and back, and about five tons of sand were spread.

Leslie Proctor, truck driver for National Capitol Park Bureau, testified that on arrival at work at 7:30 a. m. on January 23 he was told to sand near Forestville Road; that the sander was already loaded; that it took him 30–35–40 minutes to get to the scene of the accident; that when he arrived he did not see any ice, but did see water, and snow on the road where cars had "put on and off"; that he did not see any use in sanding. However, Thorne told him that as long as he had the sand he might as well use it; so he sanded from Proctor's car to or near Forestville Road and back, on both lanes, using about one-half his ten-ton load.

From the foregoing the court finds as facts that an icy condition, at least 25 feet in length, and 6–8 feet in width, was present on the westbound lane of Suitland Parkway at the place where Stewart's auto skidded, from before midnight on January 22, 1956 until after the collision in which Stewart and Donald were involved, that past experience should have led the Government to anticipate at least the possibility of such condition; that the condition was dangerous to automobile traffic; and that the size, location and duration of the ice patch were such that the Government by the use of reasonable care in patrolling the Highway should have discovered the condition in time by the use of reasonable care to have sanded the ice or provided effective warnings thereof; but that the Government either failed to discover such condition (or, if it could be

found that Moskaitis [14] and/or Hayes did in fact become aware of the ice), failed to remedy or warn of such condition. The court rules as a matter of law that the failure of the Government to discover, or after discovery to remedy, such condition, was negligence, and was at least a proximate cause of the collision in which Stewart and Donald were involved.

■ Having found primary negligence on the part of the Government, it is now necessary to determine whether or not the negligence of either Stewart or Donald directly contributed to his injury, the law of Maryland being clear that the contributory negligence of a plaintiff will bar him from recovery, regardless of its ratio or proportion as contrasted with that of the defendant. Farrell Lines, Inc. v. Devlin, 1956, 211 Md. 404, 415, 127 A.2d 640; Baltimore & Ohio R. Co. v. State, Use of Woodward, 1875, 41 Md. 268, 299; Northern Central Railway Co. v. State, Use of Price, 1868, 29 Md. 420, 435.

Contributory Negligence

■ " * * * [I]f the plaintiff's testimony makes out a prima facie case of negligence, and does not disclose want of care on the part of the" plaintiff (living or deceased) "the burden is on the defendant to establish contributory negligence, if that is relied on." Baltimore & Ohio R. Co. v. Stumpf, 1903, 97 Md. 78, 91, 54 A. 978, 980; Love v. State, for Use of Nelson, 1958, 217 Md. 290, 295, 142 A.2d 590.

The pleadings do not raise, and the evidence does not present, any issue as to any negligence on the part of Donald in any way contributory to his injuries.

■■ As to Stewart, the Government pleaded his contributory negligence, and

seriously and earnestly contends that his negligence caused or directly contributed to his injury and death, and bars all claims with respect thereto. In addition to the formal burden of proof of contributory negligence, above set forth, there is in Maryland the "presumption" that a decedent "exercised ordinary care for his own safety in accordance with the natural instinct of human beings to guard against danger." State to Use of Ridgway v. Capital Transit Co., 1950, 194 Md. 656, 663, 72 A.2d 245, 248; Baltimore Transit Co. v. State, Use of Castranda, 1950, 194 Md. 421, 434, 71 A.2d 422; Davidson Transfer & Storage Co. v. Baltimore Transit Co., 1944, 183 Md. 263, 273, 37 A.2d 326; State for Use of Chenoweth v. Baltimore Contracting Co., 1939, 177 Md. 1, 20–21, 6 A.2d 625; Baltimore & Ohio R. Co. v. Stumpf, 1903, 97 Md. 78, 90–91, 54 A. 978. But such a presumption is not "substantive evidence", and is "only to be indulged in the absence of proof to the contrary" Maryland Central R. Co. v. Neubeur, 1884, 62 Md. 391, 402; State for Use of Chenoweth v. Baltimore Contracting Co., 1939, 177 Md. 1, 20–21, 6 A.2d 625; and a deceased person may nevertheless be held guilty of contributory negligence as a matter of law. State to Use of Ridgway v. Capital Transit Co., 1950, 194 Md. 656, 663, 664, 72 A.2d 245.

■ The court does not understand that the Government contends that Stewart was guilty of contributory negligence as a matter of law. So to rule, the negligent act must be distinct, prominent and decisive, and one about which "ordinary minds would not differ", Burkert v. Smith, 1953, 201 Md. 452, 459, 94 A.2d 460, 463; which would "leave no room for differences of opinion thereon by reasonable minds". State, to Use of Bran-

14. Bragg testified that after he arrived on the scene of the accident he talked with Moskaitis, and Moskaitis said that he was afraid something like this was going to happen, for he had tried to get some sand around 4–5 a.m. Moskaitis flatly denied any such conversation, or any call for sand. In this latter aspect, he is corroborated by the absence of any record of such request on the headquarters tape. Moreover, Bragg admitted that such a statement was important and should have been reported; he could not remember if he did report it. His signed statement contains no reference to any such conversation.

The court finds as a fact that no such statement was made by Moskaitis.

dau v. Brandau, 1939, 176 Md. 584, 589, 6 A.2d 233, 235. See also Conowingo Power Co. v. State, Use of Marshall, 4 Cir., 1941, 120 F.2d 870, 874–875. In whichever category the mind of the court may be placed, it is unable to find contributory negligence as a matter of law on the part of Stewart. The ruling on this defense as a matter of fact presents much greater difficulties.

Porter testified that he was driving at forty-five to fifty miles per hour when he first saw Stewart's car skid, at which time the two cars were 400 feet apart; that the cars travelled 150–200 feet after the second skid before the collision occurred. Porter had applied his brakes and pulled a little to the right. Wirth, a passenger in Porter's car, testified that when he saw Stewart's car skid he knew it was coming over into the eastbound lane; that he did not know how far apart the cars then were; that Stewart's car started sliding sideways and continued to slide that way until the collision; that he saw the "boy on the passenger side [Donald] throw his hands over his face, and the driver fighting with the wheel."

Booth in his deposition taken on behalf of the plaintiffs testified that he was travelling eastbound at 50 miles per hour and came up behind Porter's car, travelling at about the same speed. He saw Stewart's car approaching at "approximately 40 to 50 miles per hour." At that time Booth was approximately 50 yards behind Porter's car. When Booth saw Stewart's car first swerve to the right, Booth applied his brakes and came to a stop about 15 feet behind Porter. On cross-examination he stated that he was about 250 feet and not more than 300 feet from Stewart's car when Stewart lost control, and that Stewart travelled less than 200 feet from the ice to the point of collision; that after the collision Stewart's car was "approximately 50 feet" from the ice; the two collision cars being about 25–30 feet apart. In response to further questions on cross-examination as to whether he thought the speed of the three cars—his, Porter's and Stewart's—was "reasonable speed * * * considering the condition of the highways, degree of light, time of day, and so on?" his answer was: "I certainly do, yes, sir."

Carr, a postal truck driver, testified that he was proceeding east on the Highway, behind Booth and Porter; that his attention was distracted by a car off the road to his right, but out the "corner of his eye" he saw Stewart's car cross the center line into the path of Porter's car, and within a second or two collide. His truck was travelling 40 miles per hour before the accident.

The court questions, as did the earlier Maryland decisions, the ability of the ordinary driver to estimate accurately in miles per hour the speed of an approaching vehicle. In State, for Use of Henderson v. United Rwys. Co., 1921, 139 Md. 306, at page 309, 115 A. 109, at page 110, the court in upholding the trial court's refusal to permit a witness (an attorney) to answer a question as to the speed of a car, said:

"* * * There had been no evidence to justify Mr. Rhodes in testifying as an expert upon the point. He could, of course, have testified as to whether the car was moving rapidly or slowly, but not to fix the rate of speed at so much per hour, without having shown some special knowledge which would enable him to speak as an expert. Mantik's Case [United Rys. & Electric Co. of Baltimore v. State to Use of Mantik], 127 Md. [197], 205, 96 A. 261."

In Askin v. Long, 1939, 176 Md. 545, at page 552, 6 A.2d 246, at page 249, in commenting upon the testimony of the plaintiff, the court said:

"* * * He testified that he could not estimate its [defendant's auto's] speed, and in that he was probably right, as one is in no position to judge the speed of an oncoming car. One has to see a car go by to even be prepared to make a guess at its speed."

However, in People's Drug Stores, Inc. v. Windham, 1940, 178 Md. 172, 12 A.2d

532, the court, after stating that the holding in the Henderson case "is the law of this State, although contrary to the weight of opinion elsewhere" (178 Md. at page 182, 12 A.2d at page 537) went on to explain that any driver who obeyed the traffic laws would qualify as an "expert", saying:

* * * "But it is obvious that in using the term 'expert' in State v. United Rys. Co., supra, the court did not have in mind only a person who had specially trained himself by study and observation to estimate the speed of moving objects, but rather any one who had by actual personal experience become familiar with the operation and speed of automobiles, whether his knowledge was gained through the personal operation of automobiles for business, or for pleasure, or as a traffic officer, or through experience in estimating the speed of moving automobiles operated by others, Hopper, McGaw & Co. v. Kelly, supra [145 Md. 161, 125 A. 779], for in the operation of an automobile over public highways for any purpose the driver must, to obey the traffic laws, constantly note its speed, and as well the speed of other automobiles which pass it, or which it passes, in terms of miles per hour, and so gain experience which should qualify him to estimate in such terms the speed of a moving automobile which he has observed. And ordinarily such evidence is not only the best but the only evidence available.

"Such an estimate is necessarily approximate and not exact for without mechanical aids it is manifestly impossible for any one, expert or non-expert, to estimate precisely the speed of a moving object, and that fact is assumed by every one possessing ordinary common sense."

This language is quoted or referred to with approval in Miller v. Graff, 1951, 196 Md. 609, 617, 78 A.2d 220; and Baltimore & Ohio R. Co. v. Wright, 1951, 198 Md. 555, 563, 84 A.2d 851. Four of the five cases (Henderson, Askin, Miller and Wright) were cases of vehicles approaching the witness at approximately right angles. In Windham, the vehicle was being driven almost directly towards the witnesses. These are therefore not cases of vehicles approaching from directly opposite directions (as were the Jennings-Porter vehicles). The court however admits in evidence the testimony as to speed, but regards it simply as the equivalent of testimony that the witnesses did not regard any of the speeds as unusual or remarkable; and in appraising this evidence the court has in mind the "weakness of adjectival generalizations as the basis" for conclusions in the field of negligence. Jones v. Baltimore Transit Co., 1956, 211 Md. 423, 429, 127 A.2d 649, 652.

The Government urges that the estimates of speed by Porter and Carr are in conflict with other established facts, or necessary inferences. The Government urges as such contradictory facts the testimony of Porter that on Stewart's first skid the two vehicles were 400 feet apart and that another westbound car passed Porter at the same time. From this, and Wirth's statement that traffic was normal on January 23, it is reasonable to assume that other westbound cars had safely traversed the identical spot earlier that morning; one, only a few seconds before Stewart's car. Further, it is urged that if this particular spot were such a notorious one, and if regular users of the Highway such as Mintz, Crickard and Middleton anticipated the possibility of danger and slowed down, Stewart also should have been on the lookout; and as the ice was seen without difficulty by Miller and Humphries, and by Carr on his return trip, so it should have been seen by Stewart; and would have been except, as the evidence shows, Stewart was late in leaving home that morning because Donald had detained him. A partial, but only a partial, answer is that Stewart had moved to Forestville Road on Jan-

uary 8, 1955, and although living there for slightly over a year, had during that time encountered only two heavy snows.

On the basis of the testimony of Booth, Love and Bragg, the court finds as a fact that Stewart's auto travelled at least [15] 200 feet from the end of the ice patch in the westbound lane to the point of impact. From this the Government argues that a skid of this distance, and the failure to regain control, straighten out the car, stop, or,—from the photographs of the damage and the fact that Stewart's car was a total wreck—appreciably to slow down, an inference of excessive speed and/or failure to use reasonable care after the skid, should be drawn. The testimony by Love that he looked for but saw no skid marks was in effect cancelled out by his further testimony that he was not surprised at not finding any, since the road between the point of impact and the ice was wet.

While normally it might be expected that a skid laterally some six or seven feet across the center line could have been corrected, in whole or in part, within 200 feet, the wet, and perhaps partially snowy or icy condition of this section may be an explanation consistent with the use of due care. There is also Wirth's graphic description of Stewart "fighting with the wheel." Of significance also is the fact that Porter's automobile although braked on what seems to have been a dry lane, had not come to a stop before the collision; and that Booth, travelling 150 feet behind Porter, came to a stop only 15 feet in back of Porter (meaning Booth travelled 135 feet more than Porter).

■ On all the evidence and in view of the presumption of due care on the part of the deceased, the court is unable to find that the Government has met its burden of proving Stewart's contributory negligence by a fair preponderance of the evidence.

The court therefore finds as a fact that Stewart was not guilty of contributory negligence.[16]

## Damages
### Civil Action No. 9063—Administratrix's Suit.

■ It was stipulated that Stewart's automobile was a total loss, and that its fair value before destruction was $350. It was also stipulated that Stewart's funeral expenses were $952.60. Each of these items is now properly allowable under Maryland Code of Public General Laws, 1957 Edition, Article 93, § 112. However, at the time that the administratrix's cause of action arose, and at the time that suit was brought, funeral expenses recoverable were limited to $500 (Article 93, § 111, 1951 Code) and, accordingly, must be so limited in this suit as section 2 of chapter 640, Acts 1957, approved April 10, 1957, increasing such recovery to $1000, provided that the Act should not take effect until June 1, 1957 (Herrick v. Sayler, 7 Cir., 1957, 245 F.2d 171).

■ Claim is also made for "Administrative costs $53.10" and "Reasonable attorneys' fees for administration of estate $200.00." In the opinion of this court, neither is an allowable item; neither is the kind of personal action that "the * * * intestate might have commenced and prosecuted." (Article 93, § 111, 1951 Code). In addition, the Orphans' Courts are the appropriate bodies to determine what are reasonable attorneys' fees. No evidence of any such determination was offered.

■ The administratrix also claims $1,500 for conscious pain and suffering

---

15. The purported actual measurement, made with a measuring wheel, is 212 feet. Booth's testimony would permit a distance of 200–250 feet. There is also some testimony that Porter's car did not move after the collision; and that the autos "bounced back" some distance, and ended up 25 feet apart.

16. The question is a very close one, and the court's mind is more nearly in a "state of equipoise or even doubt" than in any other case in which it has participated.

of the decedent. The applicable law is found in Tri-State Poultry Co-op., Inc. v. Carey, 1948, 190 Md. 116, at page 125, 57 A.2d 812, at page 817, where the court said:

"From these authorities we think, in order to recover in a case like this, three elements must concur: 1. that the defendant's negligence was the direct and proximate cause of the accident; 2. that the deceased lived after the accident; and 3. that between the time of the accident and the time of death he suffered conscious pain. If these elements are established the plaintiff is entitled to recover. The period between the accident and death may be short, yet, if the evidence shows that the decedent lived after the accident, was conscious and suffered pain, his representative is entitled to recover in an action like the one in this case. The burden of proof is upon the plaintiff to show by a preponderance of evidence the elements necessary to establish the action * * *"

The only testimony on this question is that of the two members of the volunteer ambulance crew who removed Stewart from his wrecked automobile, and took him to the hospital. One of these testified that he administered oxygen to Stewart who "appeared to be breathing at first" but this stopped before the hospital was reached, and that his eyes then sank back in his head and his mouth remained half open. He further testified that Stewart "seemed like he was half-conscious at intervals." The other member, who was the driver, testified they gave their first attention to Stewart who was in the "worst shape"; that he was then semi-conscious and alive; that the witness learned that Stewart died en route.

 The death certificate shows death from hemorrhage and shock; that there was a fracture of the base of the skull and of the right "thy" (thigh).

There was no expert testimony that a person in Stewart's condition would be conscious of pain. The lay witnesses' meaning of "half" or "semi" conscious was not amplified; there was no testimony of moaning, groans or any audible sound, or writhing or twitching of the limbs or body.

The court accordingly finds as a fact that the decedent did not experience conscious pain and suffering; and concludes as a matter of law that plaintiff failed to sustain the burden of proof on this point.[17]

Let judgment for the plaintiff in the amount of $850 be entered in Civil Action No. 9063.

Civil Action No. 9064—Death Suit.

 The rule as to damages in suits under Article 67 of the Maryland Code of Public General Laws, 1951 Edition, for wrongful death has been stated by the Maryland Court of Appeals in Baltimore Transit Co. v. State for Use of Castranda, 1950, 194 Md. 421, 436–437, 71 A.2d 442, 448, as follows:

"This Court has held that in any action brought under the statute for death caused by negligence, the jury may award damages for pecuniary losses which have already been sustained by the equitable plaintiffs and for pecuniary losses which they may probably suffer in the future as the result of the death. No damages shall be awarded as a solace for the grief or mental suffering of relatives of the deceased. Baltimore & Ohio R. Co. v. State, to Use of Mahone, 63 Md. 135, 146; United Railways & Electric Co. of Baltimore v. State, to Use of Mantik, 127 Md. 197, 205, 96 A. 261. In the case of the children of a person killed by negligence, the jury may estimate the prospective damages up to the time of their marriage or majority. The children may recover for the loss of the comforts, education and

17. Were there to be a recovery, the court would fix the ranges as $500–$1,000.

position in society which they would have enjoyed if their father had lived and retained his income and they had continued to form part of his family. Baltimore & Ohio R. Co. v. State, to Use of Rauer, 60 Md. 449, 467."

See also, State of Maryland to Use and Benefit of Gaegler v. Thomas, D.C. D.Md.1959, 173 F.Supp. 568.

■ Such recovery is measured by "the present value of the pecuniary benefit which the wife and children of the deceased might reasonably have expected to receive from him if he had not been killed." United States v. Guyer, 4 Cir., 1954, 218 F.2d 266, 268.[18]

Stewart Jennings at the time of his death was apparently in good health, as were his wife and three children. At the opening of the trial the four children were present. The court's mental and pen note was that they were "nice looking, healthy and clean." Mrs. Stewart Jennings was present throughout the trial, and made a very favorable impression.

Stewart Jennings was apparently a devoted and considerate husband and father. He was employed at the Naval Gun Factory in Washington, D. C. He was in salary, Grade GS–11, earning approximately $7,000 a year. His superiors spoke highly of his work and his ability. There is every reason to assume that he could at least have remained in Grade 11, and received the periodic increases automatic with the passage of time, and satisfactory service.

The joint life expectancy of Stewart and his wife, as of January 23, 1956, was 29.45 years. His children were (Stewart Jr. being *en ventre sa mere*):

Anna Francis Jennings, born December 13, 1948

Russell Earl Jennings, born September 21, 1953

Gregory Stewart Jennings, born September 27, 1955

Stewart Earl Jennings, Jr., born October 14, 1956.

Whether Stewart would have progressed further than Grade 11; have left for a job that would have proved better or worse; taken optional retirement at age 65; undertaken substantial overtime work; engaged in supplementary work (he was fitting up a radio and TV repair shop in his basement); become ill or died; deserted his family— are all so speculative that the court will assume merely that he would have remained in Grade 11 and received periodic increases until his death. On this assumption the parties are agreed that his *average* gross earnings per year, on the basis of pay scales in effect at the time of trial, would have been $8,460 for the full joint life expectancy of 29.45 years.

Plaintiff's testimony was that at the time of his death Stewart annually spent approximately $1,250 upon himself for purely personal matters. It is reasonable to assume that these personal expenditures would have increased with his salary increases. A strong argument could be made that they would have increased more rapidly in proportion.

18. Counsel for plaintiff pointed out that certiorari was granted in Snyder v. United States, 1955, 350 U.S. 906, 907, 76 S.Ct. 191, 100 L.Ed. 796, and that the per curiam decision of the United States Supreme Court was: "The judgment of the Court of Appeals [4 Cir., 218 F.2d 266] is reversed and the judgment of the District Court [118 F.Supp. 585], reinstated." This is correct, but it relates only to the Snyder cases, and only to the reduction by the Court of Appeals of the awards for the deaths of the two minors. See 76 S.Ct. 191. No petition for certiorari was filed on behalf of the Guyers. The United States Attorney stated in open court that the Guyers had been paid the exact amounts of the judgments as reduced by the Court of Appeals.

Accordingly, this court does not consider that the authoritative and binding force of the Fourth Circuit's opinion in the Guyer case, involving among other things the measure of recovery for the death of a husband and father, has in any way been impaired.

However, the court will conclude that relatively the same ratio would have continued, and treat this figure as $1,500. This would leave an annual figure of $6,960.

The Government contends that the amount available to Stewart and his family for all purposes was the net amount after taxes; and therefore the awards to the widow and children should be reduced by similar amounts. Support for this is found in O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 583, 584. It was not mentioned by the Fourth Circuit in the Guyer case. It is apparently against the weight of authority. Gregory & Kalven, Cases and Materials on Torts, p. 468 (1959); 2 Harper & James Torts, § 25.16 (1956); Annotation: "Propriety of taking income tax into consideration in fixing damages in personal injury or death action" 63 A.L.R.2d 1393; 16 NACCA Law Journal 212; 32 Nebraska Law Review 491 (1953); 8 Arkansas Law Review 174 (1954); 51 Colum.L.Rev. 782 (1951); and see also Nordstrom, Income Taxes and Personal Injury Awards, 19 Ohio St.L.J. 212 (1958); Jolowicz, Damages and Income Tax, 17 Camb.L.J. 86 (1959).

Additionally, the court considers this proposed specific reduction inappropriate here, although the decedent's liability for taxes has been considered as one of the relevant elements in fixing the award. Presumably, like the poor, income taxes shall always be with us—but at what rates and with what exemptions? In this case, with a wife and three children, Stewart's income tax for 1955 was $600; just about the amount of his overtime earnings. His son born in October 1956 would have been an additional deduction, with perhaps more in the future. Also, at least the earnings or income from any award, if not the award itself, would be taxable to the widow and children, and the widow would not have the benefit of a joint return.

Finally, if the "available net" requires the deduction of income taxes Stewart would have paid if he lived, the court knows that the awards, whatever they are, are not going to be "available net" to the widow and children; they are going to be reduced by well-earned attorneys' fees. United States Code, Title 28, § 2678.

In the Guyer case (widow and three children) the Fourth Circuit said (218 F.2d at page 268):

"* * * Of course, the deceased's living expenses were a substantial part of the living expenses of the family of which he was a part * * *"

and allowed the widow and children two-thirds of the amount on which the family had lived before the husband's death.

In O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 583, the court considered that two-thirds (after income taxes) would be proper for the widow and her son during the son's minority, and one-half for the widow after the son became of age.

Aside from the fact that the two adults and three (or four) children would not have lived as cheaply as one adult and the same children, in this case a substantial part of expenditures, apart from Stewart's personal items, would have inured to his benefit, since the house in which he lived was subject to a very substantial mortgage which was being reduced by monthly payments.

The Government further argues that the Civil Service Retirement Fund mandatory contributions of 6½% should also be deducted. The court does not consider that enforced savings should be so treated.

Under all the circumstances, the number of children, and the fact that Stewart's personal expenses have been treated separately, the court believes that three-fourths, or $5,220, of the balance after such personal expenses should be considered as available for the widow and four children during their minority, and one-half, or $3,480, available to the widow after the youngest child becomes of age.

The parties are likewise in disagreement as to the rate that should be used in commuting to present value sums payable

over a period of time. While the Government offered evidence that AAA 30-year bonds were on the last day of the trial being offered at figures producing a yield of 4.75% , the court believes 4% (particularly since no specific deduction for income taxes has been made) to be a fair rate; which is the rate generally used in this District during the past year in death and permanent injury cases.

The two elder children are attending parochial school. The annual costs for each are: tuition, $20; books, $10; special books, $3; bus $1.75 per week for the two. The parents had discussed their desires to send their children to college. Parochial high school courses were planned.

The court will enter judgment in rounded figures, based upon the mother receiving the benefit of $3,480 for 29.45 years, and each of the children $450 (¼ rounded of $1740) until the age of majority; [19] all commuted at 4%:

| | |
|---|---|
| Anna Jennings | $60,000. |
| Anna Francis Jennings | 4,800. |
| Russell Earl Jennings | 6,000. |
| Gregory Stewart Jennings | 6,400. |
| Stewart Earl Jennings, Jr. | 6,500.[20] |

Plaintiffs ask for interest at 4% from January 23, 1956. There is no precedent for allowing interest in tort claims for personal injuries and death. If allowable, it would be only on postponed or delayed earnings on the principal sums. The above awards relate to periods beginning January 23, 1956 (or date of birth of Stewart, Jr.). If the use plaintiffs wish, they may either postpone the beginning and delay the ending of the

period; or they may increase the annual withdrawals over the remaining period.

Insofar as the allowance of interest may be discretionary, the court in its discretion denies interest. There can be no question but that the Government's contest of the suits was in good faith, and with reasonable justification. Civil Action No. 9313—Donald's suit.

Donald's suit involves certain conceded expenses; and the typical questions of the proper awards for pain, suffering, scarring and permanent partial physical disability. In addition it is claimed that the accident caused, evoked, or aggravated a serious mental disturbance.

Donald was rendered unconscious by the impact. He regained momentary consciousness within a day or two, but did not become really oriented for about a week. The medical testimony is that he sustained a severe concussion; two lacerated wounds of the forehead and one of the right hand; a compound comminuted fracture of the shaft of the left femur; and a minor nondisplaced fracture of the second and third metatarsals of the right foot. Direct visual manual reduction of the femur was made through the open wounds. Wires were placed through the left heel and below the left knee for traction, which continued for twelve weeks. During this period a bed sore developed. On April 4, 1956, splints were removed and a weight-bearing brace, from the foot to the pelvis, was applied. Donald was released from the hospital on June 15, 1956, but wore a brace until October 1956. He then went to crutches, and

19. Here again an accountant would probably wish to change the ratios as each child reached his or her majority, but the possibilities are infinite as to the increasing needs (school, health) or decreasing needs (part or full time employment) of each child. The court sees no merit in purporting to give the appearance of partial mathematical certainty to a problem the totality of which is so filled with intangibles, and the solution of which is so largely a matter of judgment.

20. In the case of the widow, it will take $17,456 to yield $1,000 per year for 29.-45 years at 4% . The award is $17,456 x 3.48.

In the case of the children, the amount necessary to yield $1,000 per year at 4% from January 23, 1956 (or as to Stewart Earl Jennings, Jr., from birth), to their respective majorities are $10,-704; $13,225; $14,159 and $14,302; in each case multiplied by 0.45.

then a cane. He was totally disabled for one year.

A scar above the right eye at the outer aspect, near the temple, just below the hair line, is a slight depression scar, scarcely noticeable and not disfiguring; one on the left side of the face extending downward from outside the eye, about an inch and one-half long, is obvious, but not irritated or repulsive; there is a palmar scar on the right hand from the outer edge to below, and then up to, the ring finger, with slightly raised scar tissue, freely moveable; and the deep depression scars on front and back of left leg, where the bone pierced, are all well healed. A remarkably fine result has been obtained in the fracture area, with only ¼–½ inch shortening, but with some atrophy of the quadriceps muscle. Plaintiff's doctor (the attending physician) estimated a permanent partial disability of the left lower extremity of 20–25%; the Government's orthopedic specialist of 15–20%. The latter considered that the objective findings were some shortening and a slight bowing of the femur; about one-inch atrophy of the muscles six inches above the knee; and 10 degrees loss of flexion. While the shortening of the leg may have occasioned some scoliosis the court finds that the plaintiff has failed to establish by a preponderance of the evidence that this will lead to an arthritic condition, or to any probable (as distinguished from possible) increased disability.

Injuries of this type, and the necessary treatment, are quite painful, but Donald either does not recall, or cannot narrate [21] any substantial recollection of, extreme discomfort. He simply described his discomfort as just a steady pain in the leg until he became accustomed to traction, which did not take too long, just a few days; and said that he was quite comfortable after he became accustomed to the idea that he was going to have to stay in the hospital a long time. From the stand he denied any present pain or discomfort; on walking

he notices no difference in feeling in either leg; neither tires more than the other; and he bowls regularly at least once a week.

For the elements of damage above mentioned—pain and suffering past and future (if any), permanent partial disability, scarring and loss of earnings during the one year of temporary disability, the court finds and awards to Donald (the first three items being agreed upon by plaintiff and defendant):

| | |
|---|---|
| Dr. Joseph Rogers Young (attending physician) | $1,100.00 |
| Casualty Hospital | 2,338.00 |
| Loss of earnings (one year at $20 per week) | 1,040.00 |
| Pain, suffering, scarring, permanent partial disability (20% left lower extremity) | 17,500.00 |
| | $21,978.00 |

In his opening statement, Donald's trial counsel stated that following the collision Donald had undergone a personality change; that he was now lazy, had not sought or obtained employment; and would just sit and stare. The court therefore paid unusually close attention to Donald's attitude during the trial, which began on September 14, 1959, and continued through September 16, at which time an adjournment was taken to September 21. Trial was resumed on that date. On September 22, the fifth day of the trial, at the conclusion of Donald's direct examination, counsel approached the Bench, and Donald's counsel stated that Donald's phlegmatic appearance during the trial had puzzled counsel, and counsel had had Donald examined by a psychiatrist over the weekend. The court had noted during the trial that Donald had been quite impassive, with little change of facial expression, but had appeared quite attentive; had spoken a few times to Mrs. Anna Jennings, and had written several notes to counsel. The court's notes on Donald's examination were that his answers

21. Per plaintiff's psychiatrist.

were direct, prompt and clear, but that his eyes did not light up, except when the court questioned him on sports; and once during a brief conference of counsel at the Bench Donald had "kidded" the bailiff on the way the bailiff had tied his tie. The court had also marginally noted, in the course of Donald's direct examination when he was describing his rather rapid adjustment to traction, that there was "no build up" of his claims.

In his cross examination Donald smiled when he explained that his bowling average, last year 100, had risen in the last few months to 122. He also explained that he went to a few ball games because the Washington Senators were in last place.[22] He also would sometimes "catch a football in the alley with a few kids."

Donald explained that when he first came out of the hospital he looked for jobs, but he had to disclose his accident, which was perhaps why he failed to obtain employment. He had quit trying, although he did not actually know the reason why. In response to questions by the court, he said he did not know if he would take a job involving photography, in which he had been very interested, if it were offered; he had lost interest; he didn't know what he was interested in; he lived on an allowance from his mother.

Donald had testified to attendance at a District of Columbia Vocational School for two years, with a C average. His mother, a Government employee, was then transferred to Atlanta, Georgia, and Donald went to live with her. There was no vocational school in Atlanta giving courses in photography, in which Donald was interested, so he did not attend school. From other sources it was developed that he worked part time,

earning about $10 a week. He had very infrequent dates.

In September 1955 Donald came to Maryland and lived with Stewart, Mrs. Anna Jennings, and their family. He re-entered vocational school, to finish his last year of high school in June, 1956. It was not expected that he would then continue to live with Stewart and his family.

In addition to his school work, Donald took a job as messenger for a Washington newspaper, working five nights and all day Saturday, a total of twenty-three hours a week, for which he received $20. He did not contribute anything to Stewart, but spent his money on travel, lunches and dinners, and some amusement. After his injuries, he continued his studies in the hospital, and took examinations resulting in passing grades.

The psychiatrist, who examined Donald on September 18, 1959 (Donald's psychiatrist) testified on September 23, 1959. His one, and only, interview, lasted about one and one-half hours. He sent Donald to a psychologist, whose report confirmed the psychiatrist's clinical impressions.

Donald's psychiatrist advised Donald's exclusion from the courtroom during the psychiatrist's testimony, because Donald "suffers from a very serious mental disorder. As part of his picture, he has no acceptance of the fact that he has this mental disorder. In order for him to recover from it, if this is indeed possible, he would have to accept the fact that the illness is present. To force him to hear of this, under very acute and sudden situations, might indeed raise his level of anxiety, and, therefore, make his illness even worse."

He then expressed the opinion that Donald "has a condition known as schizophrenia[23] * * * paranoid and cata-

---

22. Washington: "first in war, first in peace, first in the hearts of his countrymen; last place in the American League."

23. "Schizophrenia is an exceedingly serious mental disorder in which the total personality undergoes a disturbance." The thinking and feeling parts of Donald's life are in disharmony. His thinking is illogical. "He has, in essence, a blunting of the feelings; he has no color left to himself. He is bland. * * * The disparity between his feelings and his thinking is so intense that for practical purposes, he is paralyzed from constructive activity."

tonic[24] * * * sufficiently severe as to incapacitate him." He was then asked as to his "opinion" as to what, if any, part the accident played in the production of, or development of, Donald's mental illness, and replied that in his opinion "as a result of the accident and the circumstances invoked [evoked] by the accident that his condition was definitely aggravated."

Donald's psychiatrist was then asked to explain his answer. As this testimony is the basis for the claim of a very substantial monetary award, and as it raises an important legal issue, it is set forth in full, as follows:

"* * * There are several factors that I have in mind here and I would like to be able to enumerate them for you. In the first instance, we are dealing with a trauma to the head, which resulted in a period of unconsciousness for two days. The young man actually has an amnesia, which includes the period of several hours prior to the accident itself.

"The very fact that an individual has a period, in his life that is an important period, where he is unable to recollect important details, might be considered a stressful situation. What I am getting at here, sir, is this: that his condition, the condition that he has, schizophrenia, was aggravated by increasing strain and stress produced by the accident. I have just told you one.

"Secondly concerns the death of his brother. The brother, the deceased Stewart, was the one person whom Donald could look up to as a good example in his life. The rela-

tionship between Donald and his mother has not been an emotionally healthy one. By a quirk of fate, the mother was transferred from Washington to Atlanta because of her job. Donald, wanting to continue his education; having this admiration for his brother, requested permission to live with his brother and sister-in-law, which was granted. He had an example in Stewart, a well motivated, hard working, rather successful individual. The death of the brother left him without that inspiration, without that good example in his own life.

"I should like now to go on to additional factors. Because of the circumstance of the accident with the death of Stewart with the mother being called back to Washington because of Donald's serious injury, [it] was arranged for Donald to return to live with his mother. From Donald's point of view, despite the mother's very best intentions, this was an exceedingly unhealthy thing from the point of view of the further development of his personality. He was put into a situation, literally, where his normal health and development was prevented. There is reason to believe that this would not have happened, had the accident not happened. Had the accident not happened, Donald would have continued living with Stewart, and having that relationship, that good example, an ideal, in his life.

"The death of his brother added a great deal of strain to him; as did the fact that circumstances forced

24. "The paranoid, in this context, sir, refers to a quality in the personality where an individual just is truly incapable of developing a closeness and trusting type of relationship. He is primarily motivated by distrust, hence, the kind of answers you get from him would be evasive or negativistic.

"Now, if that paranoid condition becomes severer, then he actually has delusions that people are plotting against him and trying to kill him and the like.

Now, the catatonic, sir, refers to a certain quality in the illness which sends the patient in the direction of a rather disorganized type of behavior. This can take the form, as the illness gets worse, either of the condition of excitement or interestingly enough, exactly its opposite, where the patient becomes, in essence, a human statue, without movement at all. This is, sir, what I meant by the paranoid and catatonic types."

him to resume living with his mother. It is reasons like I have just enumerated that I feel the condition he suffers from was aggravated by the accident.

"Q. It is enforced invalidism for a year—

"A. Yes, sir. I am glad you reminded me of that. Let me put it to you this way: the invalidism itself, complete with restriction to bed, traction, braces, crutches, put Donald in a dependent situation, a situation which he was forced into. It is known that not infrequently when an individual is forced into a dependent situation he may have very great difficulty in extricating himself from such a dependent situation. Had circumstances not forced him to live with his mother, who perpetuates a dependency type of relationship, he would, of course, be much better off, but such is not his lot.

"Q. What do you mean by an individual might have difficulty extricating himself in a dependency situation?

"A. There are feelings there that we humans are aware of, and there are feelings that we are not aware of—if I may use the term 'unconscious feelings' for the latter.

"In Donald's instance, he has feelings of which he is unaware, which without his realizing it lead him to form a relationship with somebody in which he remains a rather childlike dependent individual instead of, of course, standing on his own feet and making a life of his own. Now, it is known, from our studies of hospitalized patients, people who have had to be in bed for long periods of time, that when they are forced into a situation of being taken care of, they tend, unless there is actual treatment instituted, to perpetuate the wish to be taken care of."

As to whether or not the schizophrenia antedated the accident, Donald's psychiatrist testified:

"Q. Doctor, you have expressed the opinion that the accident was an aggravating factor in the production and development of this disease. I take it then, that your opinion is that this schizophrenia pre-existed the accident. A. It may have, sir. This, I cannot say.

"Q. You don't know one way or the other, if it pre-existed it? A. That is right."

\* \* \* \* \* \*

"Q. Would you explain your last answer? You said you were unable to tell whether or not the schizophrenia pre-existed the accident or not. Would you explain what you mean by that? A. Yes, sir. In other words, sir, I cannot prove to you whether the schizophrenic illness started the day he was in the accident or whether it started six months before, or six years before. The history, as I was able to get it, indicated that he was schizophrenic while he was in the hospital, Casualty Hospital in 1956, but I cannot tell you, sir, with certainty, as to whether he was schizophrenic the day before or not. The likelihood is that there was some potential for his illness present prior to the accident.

"Q. What leads you to the conclusion that there was certain potential in this boy's case prior to the accident? A. I deduced this, sir, largely from the relationship within his family. There are certain characteristics within the characteristics of the parents which we know, not infrequently, [are] conducive to bring out such a condition.

"Q. What nature? A. Specifically the peculiar personality of his mother, in which she has a way, that despite her best intentions and devotion for her children, she is none-

theless rejecting the children. It sounds paradoxical, certainly, but it does happen, where the parent, at the same time is devoted and yet rejects the child. This sets the scenes. This is the potential for the later development of the schizophrenic reaction; that is to say, when there are further significant stresses and strains on the individual, this potential becomes clinically apparent, as it is at this time.

"Q. Is that your opinion of what happened in this case? A. Yes, sir."

That Donald's psychiatrist considered that the death of Stewart (or the removal in any manner of Stewart's "emotional support"), and the resultant return of Donald to his mother's household, were extremely important factors in "aggravation", clearly appears:

"Q. So, to a great extent, I think you said something like that, but I don't know the scientific language, he was, in his feeling toward his brother, much as though the brother was a father's substitute. A. Yes, sir.

"Q. And this could have happened to him if his brother had been killed in any other accident, is that correct? A. I presume so, sir.

"Q. Or withdrawn for any other reason?

"The brother could have moved away, or something of that sort. A. I don't know whether a move would have been as serious to the young man as his death.

"Q. So, there is some element in connection with his being connected with the accident? A. No sir, I was referring to the death of the brother, rather than Donald's presence at the death.

"Q. In other words, the brother's moving away would not have affected Donald as seriously as the death of the brother from any reason? A. Yes, sir.

"Q. That would have done away with his father? A. Yes, sir."

*　*　*　*　*　*

"Q. Well Doctor, I want to go back to this one thing: assuming that this man had either some schizophrenia, whether mild or otherwise, and the brother's support being withdrawn by the death of the brother from any other cause, or by the rejection by the brother, would you not have an aggravation of the pre-existing condition or the latent condition? A. By support, sir, you mean the emotional support; the role of the father to the brother?

"Q. Yes, sir. A. Yes, I think that would very well have aggravated his condition."

*　*　*　*　*　*

"Q. And this withdrawal that you speak of from your interview with the mother, isn't it a fact that she may be, to some extent, responsible for this withdrawal, if it exists? A. I would think you were quite right, sir, and I am not excluding her one bit from the matter of setting the seeds of the illness within him.

"Q. And, therefore, to some extent the fact that this accident caused him to live with his mother is harmful to his mental health? A. Tragic, sir."

*　*　*　*　*　*

"The Court: Does that carry with it the risk that if the one that we look up to so far exceeds what we believe our abilities, then that may give rise to a sense of frustration? Specifically, if the brother had progressed rapidly and to a very high position, and Donald found himself unable, anywhere near the stride, would that give rise to stress?

"The Witness: It might, yes sir, it might. So much would depend in that instance on how much the older brother would maintain interest in the younger brother."

The psychiatrist called by the Government (Government psychiatrist) examined Donald on two occasions, September 26, and October 1, 1959. Before the first examination the Government psychiatrist had read a transcript of the testimony of Donald's psychiatrist, had seen the report of the psychologist to whom Donald had been referred, and the hospital records, and the depositions of Donald and Anna Jennings. He rendered a written report, from which he testified, and was subjected to cross-examination.

As a result of the first examination, the Government's psychiatrist received certain impressions, which were summarized in his report (which is entirely consistent with his testimony) as follows:

"* * * To summarize: the impression gained is to the effect that this boy is showing a chronic schizophrenic reaction. Without knowing what his level of adjustment was before the accident, no statement can be made—at least on the basis of material so far detailed—to the effect that the accident either has— or has not—functioned as *the* factor —or as *a* factor—in the appearance of his present psychotic reaction. The accident was three years ago. His symptoms could therefore have developed much more recently—and still be chronic. They could have been triggered off—or precipitated out—as a result of the accident. They could have been in the process of developing before it. Without further information, no answer unfortunately can be given to this question."

While agreeing essentially with Donald's psychiatrist, the Government psychiatrist felt that at the former's examination Donald "was showing much

more marked schizophrenic symptomatology than at the time of" the September 26 examination. This made the government psychiatrist wonder whether Donald went "in and out of episodes of this kind or whether, alternatively, there has been * * * 'rapid' improvement in his emotional status * * *." Donald was accordingly referred to another psychologist, with special instructions.

The psychologist's report indicated Donald to be "a warm, alert individual, who had no difficulty relating to the psychologist at all, who answered questions readily and whose I.Q., as now tested, seemed significantly higher (around 120) than that previously obtained." Accordingly, a second session with the Government psychiatrist was arranged. His summary, after this examination and his telephone conversation with the psychologist, is in relevant part as follows:

"* * * So far as a diagnostic statement is concerned, it is possible only to state that this patient is a very passive dependent individual, tied very closely emotionally to his mother, with very poor masculine identification, whose adjustment has been a schizoid one, perhaps all his life but certainly over a very prolonged period of time. When he was seen here on September 26th, it was felt that he was showing an overt schizophrenic reaction. On October 1st (today) this was not evident. Without further study, statements made about prognosis, optimal type of treatment and probable length of treatment (pp. 14 and 15) may—or may not—hold.[25] A multi-session psychiatric evaluation now seems indicated."

The Government psychiatrist's final statement in court with respect to causal relation, vel non, between the accident

---

25. Donald's psychiatrist had recommended "psychiatric interviews, several times a week, for * * * an indefinite period of time * * * a minimum of three years. I am sorry to say it may go much longer * * * The cost of his treatment, on an average annual basis, would be around $5,000 a year." He was also of the opinion that an important part of the treatment would be for Donald to

and Donald's condition, and its initial onset, was as follows:

"Q. And as to his ambition to work, considering that he did only part time work in Atlanta over a 13 month period, and then hasn't gotten a job since, after certain initial 'turndowns', which you mentioned in the report, would that make you feel that the accident triggered or caused his schizophrenia? A. It doesn't give me enough data to reach any conclusion one way or the other.

"Q. Do you think that any one, on the basis of the data that you have, could reach a conclusion, and when I say any one I mean psychiatrist, on the basis of the data that you were able to get could have reached a conclusion as to when this schizophrenia occurred? A. Without more data, I doubt it. At least, I can't reach any conclusion as to whether this was present before the accident, during the accident or afterwards."

 The court has felt impelled to quote, rather than paraphrase, what it considers to be the critical testimony on the question of whether or not Donald's present condition is to be attributed to the accident in which he and his brother Stewart were involved. The Government's psychiatrist does not consider that he has sufficient data to permit him to determine whether or not the accident triggered Donald's schizophrenia, and doubts if anyone could reach any conclusion as to whether the schizophrenia "was present before the accident, during the accident, or afterwards." Were his view to be accepted that the data were insufficient to reach a conclusion as to whether or not the accident was a sufficient producing cause for Donald's present condition, Donald would have failed in his burden of proof. The court accepts this view based upon the more complete and detailed studies of the Government's psychiatrist including analysis of Donald's condition, school grades, social activities, etc., before the accident, rather than the view of Donald's psychiatrist, and finds as a fact that Donald has failed to prove by a preponderance of the evidence that his present condition is caused by the accident, and rules as a matter of law that he is not entitled to recover for this claimed element of damages.

The court believes that on legal principles the same result must be reached upon an analysis of Donald's psychiatrist's opinion. He agrees that the schizophrenia might have started the day of the accident, or six months or six years before. He, however expresses the opinion that the accident and the circumstances evoked by the accident definitely "aggravated" [26] his condition. The "circumstances invoked" were:

(1) Trauma to the head, with associated amnesia; (2) the death of his brother—and removal of the father-symbol; (3) Donald's return to live with his mother; (4) his enforced invalidism.

live apart from his mother, in a separate household, with the costs and expenses incidental thereto.

The Government's psychiatrist, in his report had first considered $15,000–$20,000 for psychiatric fees over a period of years, a reasonable figure. As will be seen from the quotation to which this footnote is appended, after the second examination he was unwilling to commit himself upon the amount or cost of treatment.

26. To the court, "aggravated" would seem clearly to mean making more serious an already existing condition, and not the creation of something previously nonexistent.

The court was somewhat startled by some of the stated indicia stressed by the psychiatrists—Donald's, that Donald on being interrogated about sports, demonstrated how he bowled; the Government's psychiatrist remarking how Donald, on entering the room ran his hand around the back of the couch, as if "caressing it"—; their prompt conclusions, and ruling out as insignificant any inconsistent data; and their apparent acceptance of Donald's statements without effort to verify or disprove them.

The court would have no difficulty in finding (1) and (4) proximately related to the accident, so that if (as the court has found) the Government were legally responsible for the accident, it would be liable for the consequences flowing from circumstances (1) and (4). But Donald's psychiatrist does not say that any one of the four circumstances alone would be sufficient. He apparently considers the condition to be the result of all four; and as the court analyzes the testimony, he seems to attribute greatest weight to (2) and (3). Further, it is the *fact* that Stewart was removed as the father-symbol, *not how* (death by suicide, natural causes, or the negligence of some other person; moving away physically, or being removed; loss of interest in Donald by Stewart; or Donald's frustration at being unable to approach Stewart's success), together with the concomitant return to the mother's household, and not "Donald's presence at the death" of Stewart, that aggravated his condition.

The question therefore is: In Maryland, may a brother (Donald) recover damages for a severe emotional disturbance resulting from the emotional stress attributable to his learning of the death through negligence, of his brother (Stewart), the emotional stress being both from the loss of a sublimated father-symbol, and the return of the brother (Donald) to the emotionally detrimental household of the mother? For the purpose of the question, (a) it is immaterial that the plaintiff-brother (Donald) was present at the scene of his brother's (Stewart's) death; and (b) the emotional stress is not associated with fear either for his (Donald's) own safety, or that of his brother (Stewart). As to (a), Donald did not know of his brother's death until he was told of it some days later in the hospital; and as to (b), there is no testimony as to any such fear.

No case purporting to answer the question posed has been cited by counsel or found by the court. However, the court is of the opinion that the question would be answered in the negative by the Maryland Court of Appeals.

(1) It would appear to be a most improbable anomaly that a recovery stemming from conditions produced under these circumstances would be allowed to a non-dependent brother, when the recovery allowed to a widow and dependent children for the negligent killing of the husband and father is for "pecuniary losses" but not "as a solace for the grief or *mental suffering* of relatives of the deceased." Baltimore Transit Co. v. State, Use of Castranda, 1950, 194 Md. 421, 436–437, 71 A.2d 442, 448 (emphasis supplied); State of Maryland to Use and Benefit of Gaegler v. Thomas, D.C.D.Md. 1959, 173 F.Supp. 568.

(2) In State for Use of Aronoff v. Baltimore Transit Co., 1951, 197 Md. 528, at page 531–537, 80 A.2d 13, the court reviewed numerous cases to the effect that breach of duty is anterior to liability, and then quoted with approval from Mahnke v. Moore, 1951, 197 Md. 61, 69, 77 A.2d 923, 926:

> "* * * 'In 1909, however, this Court adopted the rule that where the wrongful act complained of is the proximate cause of the injury *and the injury ought to have been contemplated in the light of all the circumstances as a natural and probable result thereof*, the case should be left to the jury.'" (197 Md. at pages 536–537, 80 A.2d at page 17, Court's italics.)

See also A.L.I. Restatement, Torts, § 435(2) 1948 Supplement.

Of significance in this connection is the court's citation of, and quotation with approval from, Cote v. Litawa, 96 N.H. 174, 71 A.2d 792, 793, 18 A.L.R.2d 216, where physical injuries from shock and fright of a mother on having her injured child brought into her presence were held noncompensable because of lack of duty of the defendant "to so conduct himself with respect to the child Patricia, as not to subject the mother, Lorraine, to an un-

reasonable risk of shock or fright, with ensuing physical consequences, upon her learning immediately after its occurrence of injury inflicted by him on her child. * * * " (197 Md. at page 533, 80 A.2d at page 15).

(3) In Mahnke v. Moore, 1951, 197 Md. 61, 69, 77 A.2d 923, 927 the court, although overruling a demurrer to the child's suit against the father's estate for "shock, mental anguish and permanent nervous and physical injuries" allegedly resulting from the father's murder of the child's mother, and the father's suicide, each in the presence of the child, was careful to announce the general rule:

"Generally, the commission of murder or suicide is not a tort against an eyewitness."

(4) In Resavage v. Davies, 1952, 199 Md. 479, 86 A.2d 879, a majority of the court held that a mother could not recover for nervous shock, and resulting physical injuries, from seeing her two daughters killed by the negligent operation of a motor vehicle, where the mother was not herself exposed to risk of physical injury by the operation of the motor vehicle.

The majority opinion stated (199 Md. 483–485, 86 A.2d 881):

"Section 312(e) of the Restatement deals with negligent acts: '(e) On the other hand, an act, which is merely negligent as threatening an immediate harm to a third person, is not negligent to another solely because of the possibility that the peril or harm of such a person may indirectly cause fear, grief or similar emotional disturbance to others because of their interest in and affection for the third person and the possibility that they may be in such a physical condition that the emotional disturbance may be physically harmful. This is so irrespective of whether the other witnessed the third person's peril or harm or is informed of it immediately thereafter or at some subsequent period, and irrespective of whether they are or not members of the same immediate family.'

"Section 313 contains a caveat, however, that: 'The Institute expresses no opinion as to whether an actor whose conduct is negligent as involving an unreasonable risk of causing bodily harm to a child or spouse is liable for an illness or other bodily harm caused to the parent or spouse who witnesses the peril or harm of the child or spouse and thereby suffers anxiety or shock which is the legal cause of the parent's or spouse's illness or other bodily harm.'

"We think the fundamental consideration is the extent of the duty owed, bearing in mind that 'no act will be considered negligence merely because in fact it causes fright and injury through it, if it had no tendency to cause anything but fright.' Bohlen, Studies in the Law of Tort, p. 289. In Waube v. Warrington, 216 Wis. 603, 605, 258 N.W. 497, 98 A.L.R. 394, a case strikingly similar on the facts to the instant case the Wisconsin court said: 'the question presented is whether the mother of a child who, although not in peril or fear of physical impact, sustains the shock of witnessing the negligent killing of her child, may recover for physical injuries caused by such fright or shock. The problem must be approached at the outset from the viewpoint of the duty of the defendant and the right of the plaintiff, and not from the viewpoint of proximate cause.' The court further said, 216 Wis. at page 613, 258 N.W. at page 501, that the duty and correlative right 'can neither justly nor expediently be extended to any recovery for physical injuries sustained by one out of the range of ordinary physical peril as a result of the shock or witnessing another's danger.' * * * "

The majority concluded (199 Md. 487–488, 86 A.2d 883):

"We adopt the view set out in Section 312(e) of the Restatement, with the possible qualification that once a duty is established damages need not be apportioned between fear for oneself and for others.[27] We are not disposed to extend the doctrine of the Bowman case [Bowman v. Williams, 164 Md. 397, 165 A. 182]; indeed, we have indicated in State, use Aronoff v. Baltimore Transit Co., supra, that it should not be extended. We see no logical reason for holding that liability does not extend to bystanders or persons less closely related than a child or spouse, but may extend to a child or spouse, as indicated in the caveat in § 313. We think the operator of a motor vehicle on the highway is not liable to spectators in a place of safety off the highway for visible shock to them. If such a rule were adopted it would involve a tremendous extension of liability to the world at large, not justified by the best considered authorities. Our conclusion, of course, does not preclude action by the mother under our prototype of Lord Campbell's act for pecuniary loss caused by the negligent killing of the children. We think the demurrer was properly sustained."

If the Maryland Court of Appeals found no breach of duty under the circumstances above reviewed, this court does not believe the Maryland courts would hold that a defendant was liable for harm occasioned by the stress resulting from a brother being told of his brother's death negligently occasioned; or by the stress of having to return to undesirable home conditions with his mother.[28] As these are the most important of the four elements of aggravation mentioned by Donald's psychiatrist, and as they are noncompensable elements, no recovery can be had for the claimed aggravation of Donald's schizophrenia.

Even if a recovery could be had, in fixing the amount it would have to be remembered that the recovery could be had only for an aggravation of a pre-existing condition, or at the most the acceleration of the onset upon a susceptible person by some six months. Donald was not to live with Stewart after the completion of Donald's high school course in June 1956. His residence in Stewart's home might well have ended before that time without Stewart's death, if Donald's tardy ways continued, or became worse.[29]

There is no evidence that Donald was, or except for the accident would have been, of any financial benefit to his mother, and every indication is that he would have been an expense. The $21,978 award will therefore be to Donald S. Jennings in his own right.[30]

The foregoing opinion constitutes the court's findings of fact and conclusions of law under F.R.Civ.P. 52(a), 28 U.S.C.A.

27. The testimony does not disclose fear by Donald of injury either to himself or Stewart. It is therefore unnecessary to consider whether or not the "possible" qualification would in fact be applied if conditions warranted.

28. The court understood Donald's counsel on final argument to concede that the effects of the stress occasioned by Donald's return to his mother's household would not be compensable.

29. Stewart's wife had not visited Donald in the hospital, or at any time after the accident. Donald did not visit his sister-in-law until one week before the trial.

If a recovery could be had for this element, the court in view of the uncertainties as to the time that the father-symbol would have continued in any event, and as to whether or not Donald either had, or was predisposed toward, schizophrenia before the accident, would have allowed not more than $15,000 therefor.

30. The Government may withhold $3,438 until furnished with satisfactory evidence that the bills of Dr. Joseph Rogers Young and Casualty Hospital have been paid; or may itself discharge those bills and credit the amounts so paid against the judgment.